# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-14-00283-CV
NO. 03-14-00360-CV

Texas Education Agency and Mike Morath,[1] Commissioner of Education,
in his Official Capacity, Appellants

v.

American YouthWorks, Inc., d/b/a American YouthWorks Charter School;
Honors Academy, Inc., d/b/a Honors Academy; and Azleway, Inc.,
d/b/a Azleway Charter School, Appellees

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT
NO. D-1-GN-14-000672, HONORABLE ORLINDA NARANJO, JUDGE PRESIDING

# O P I N I O N

The 2013 Texas Legislature passed legislation aimed, in part, at strengthening the Commissioner of Education's authority to revoke the charters of underperforming open-enrollment charter schools and at expediting that revocation process. American YouthWorks Charter School, Honors Academy, and Azleway Charter School (collectively, the Charter Schools) were among the first charter schools against which the Commissioner sought charter revocation under this new legislation. Their charter holders—appellees American YouthWorks, Inc., Honors Academy, Inc., and Azleway, Inc. (collectively, the Charter Holders)—sued appellants the Texas Education Agency (TEA) and Mike Morath, in his official capacity as Commissioner of Education, in Travis County

---

[1] Michael L. Williams was the Commissioner of Education when this appeal was filed. His successor, Mike Morath, has been automatically substituted. *See* Tex. R. App. P. 7.2(a).

District Court for declaratory and injunctive relief related to the administrative revocation process. The district court issued temporary injunctions enjoining further revocation actions regarding the Charter Schools. Our principal issue in these interlocutory appeals from those injunctions[2] is whether, under a statutory scheme that expressly precludes judicial review of the agency decisions being challenged in the underlying district-court proceeding, the Charter Holders' pleadings invoke the district court's inherent right to review those agency decisions. For the reasons explained below, we conclude that their pleadings do not and cannot invoke that inherent right to judicial review and, therefore, the Charter Holders' claims are barred by sovereign immunity.

## I.

## BACKGROUND

Before describing the underlying administrative and judicial proceedings leading to this appeal, we will briefly review the legislative history of charter schools in Texas to provide some context for the legislation that is at issue in this case.

### A.     Charter schools in Texas

Facing a self-imposed deadline of September 1, 1995, that would result in the repeal of Titles 1 and 2 of the Education Code,[3] and in the wake of a gubernatorial campaign in which then-

---

[2] On the State parties' motion, we have consolidated these cases—No. 03-14-00283-CV regarding the temporary injunction granted to American YouthWorks and Azleway, and No. 03-14-00360-CV regarding the temporary injunction granted to Honors Academy—for briefing and argument purposes.

[3] *See* Act of May 28, 1993, 73d Leg., R.S., ch. 347, § 8.33, 1993 Tex. Gen. Laws 1479, 1556. Although Titles 1 and 2 would also be casualties, the main purpose of this legislation was to reform Texas's school-finance system by introducing what is often referred to as the "Robin Hood Plan" to replace the finance system held unconstitutional in *Edgewood Independent School District*

candidate George W. Bush had emphasized education reform, the 74th Texas Legislature overhauled Texas's public-school system with extensive changes to the Education Code.[4] To deregulate the education system, for example, the 74th Legislature stripped away several state-mandated rules; limited the role and rule-making powers of the State's administrative bodies that oversaw public education; gave the governor the power to appoint TEA's Commissioner; devolved substantial authority to the local level; and, particularly relevant here, authorized state-funded charter schools as an alternative to traditional public-school education.[5]

Charter schools are statutorily created public schools that operate under a written document called a charter.[6] The Education Code recognizes three classes of charter schools—home-rule school-district charter schools; campus or campus-program charter schools; and, at issue here, open-enrollment charter schools.[7] Stated generally, a charter explains the charter holder's and the

---

*v. Kirby*, 777 S.W.2d 391, 398 (Tex. 1989). *See Edgewood Indep. Sch. Dist. v. Meno*, 917 S.W.2d 717, 750 (Tex. 1995) (holding 1993 reforms constitutional). The supreme court recently rejected the seventh challenge to Texas's school-finance system. *See Morath v. The Texas Taxpayer & Student Fairness Coal.*, __S.W.3d __No. 14-0776, 2016 WL 2853868, at *43 (Tex. May 13, 2016).

[4] *See* Act of May 27, 1995, 74th Leg., R.S., ch. 260, § 1, 1995 Tex. Gen. Laws 2207 (re-enacting and revising Titles 1 and 2 of Education Code).

[5] *See id.* §§ 12.001–.118, 1995 Tex. Gen. Laws at 2236–47 (codified as amended at Tex. Educ. Code §§ 12.001–.156) (titled "Charters"); *see also* Tex. Educ. Code §§ 12.001 (setting forth as one purpose of charters to "increase the choice of learning opportunities within the public school system"), .0011 (describing operation under a charter as "an alternative to operating in the manner generally provided by" public education).

[6] *See, e.g.*, Tex. Educ. Code § 12.112 (specifying that open-enrollment charter "be in the form and substance of a written contract").

[7] *See id.* §§ 12.002, .152. A fourth category of charter schools, "university" charter schools, are generally subject to provisions governing open-enrollment charter schools. *See id.* §§ 12.151–.156.

charter school's obligations, including what the school will attempt to accomplish, how student performance will be measured, and what levels of achievement the school will attain.[8] As state-funded public schools, charter schools must follow certain state guidelines, but they are afforded a level of regulatory freedom not available to traditional public schools in the name of affording them flexibility to "improve student learning"[9] and "establish different and innovative learning methods"[10] that best fit the needs of their students. For example, open-enrollment charter schools in Texas are, for the most part, exempt from the laws that require public schools to employ certified teachers, follow state-mandated curriculum, limit class size, or follow teacher-salary schedule and teacher-contract requirements.[11] Freed from these strictures, the charter schools are instead supposed to be carefully monitored for "fiscal and academic accountability," although not in a way that "unduly regulates the instructional methods or pedagogical innovations of charter schools."[12]

In 2001, after charter schools had been part of the public-school system for a few years, the Legislature promulgated laws modifying the structure and operation of open-enrollment charter schools by strengthening regulations regarding their governance and financial oversight and

---

[8] *See id*. §§ 12.002, 12.011–.04 (home-rule school-district charters), 12.051–.065 (campus or campus-program charters); 12.101–.136 (open-enrollment charters).

[9] *Id.* § 12.001(a)(1).

[10] *Id.* § 12.001(a)(5).

[11] *See id.* § 12.103(b) (providing that open-enrollment charter schools are subject to Education Code and rules adopted thereunder "only to the extent the applicability to an open-enrollment charter school . . . is specifically provided").

[12] *Id.* § 12.001(b).

increasing their accountability to the State.[13] This legislation also added provisions regarding charter revision, probation, revocation, denial of renewal, and audits, including making the Commissioner, rather than the State Board of Education, the State official responsible for those actions.[14] It further specified that Chapter 2001 of the Administrative Procedure Act—which establishes, among other things, procedural rules for contested-case hearings and the scope of judicial review of agency action[15]—did not apply to TEA hearings addressing modification, probation, revocation, and renewal of charters.[16]

In 2004, following TEA's scheduled Sunset review,[17] the Sunset Advisory Commission issued a report faulting TEA for its oversight of the charter-school program and recommending that the Legislature address the following problems:

- Without adequate, periodic assessment, some charter schools have gone bankrupt and may have inappropriately used State funds.

---

[13] *See generally* Act of May 28, 2001, 77th Leg., R.S., ch. 1504, §§ 2–18, sec. 12.101(b)–.130, 2001 Tex. Gen. Laws 5344, 5344–55 (codified as amended at Tex. Educ. Code § 12.101(b)–.130).

[14] *See id.* § 12.114–.1163.

[15] *See generally* Tex. Gov't Code §§ 2001.001–.902 (provisions of the Administrative Procedure Act (APA)).

[16] *See* Act of May 28, 2001, § 12, sec. 12.116, 2001 Tex. Gen. Laws at 5350 (codified as amended at Tex. Educ. Code § 12.116(c)).

[17] Established in 1977, the legislatively created Sunset process is a regular assessment of the success and continuing need for a state agency. *See* Sunset Advisory Comm'n, *Sunset in Texas 2015–2017* 1 (undated), available at https://www.sunset.texas.gov/reviews-and-reports.

- Without recent accountability ratings, TEA cannot evaluate the quality of education at charter schools.[18]

The report concluded that children in some charter schools "may be at risk of receiving an inadequate education," and "without effective ways to measure student success, parents and school officials are ill-informed as to instructional quality."[19] And emphasizing some "notable financial failures of charter schools," the report expressed serious concerns about TEA's lack of real ability "to hold charter schools accountable for expending State funds."[20] The 2004 Sunset report recommended legislation requiring TEA to implement an accountability rating system for charter schools and to closely monitor charter schools that do not receive accountability ratings.[21]

In a bill principally devoted to revising the State's tax system for school-finance purposes, the 79th Texas Legislature included an amendment to the Education Code that, among other things, made Chapter 39's public-school accountability system applicable to open-enrollment charter schools and, relatedly, required the Commissioner to adopt rules implementing the accountability system for charter schools, including rules providing a process for rating challenges.[22] Significantly, these changes to Chapter 39 specified that the Commissioner's decision on an

---

[18] Sunset Advisory Comm'n, *Staff Report*: *Texas Education Commission* 13–19 (Nov. 2004), available at https://www.sunset.texas.gov/reviews-and-reports/agencies/texas-education-agency-tea.

[19] *Id.* at 13.

[20] *Id.*

[21] *Id.* at 18–19.

[22] *See* Act of May 12, 2006, 79th Leg., 3d C.S., ch. 5, § 3.19, secs. 39.1321, .301, 2006 Tex. Gen. Laws 45, 72, 77 (current version at Tex. Educ. Code §§ 39.104, .151(d)).

accountability rating "may not be appealed under Section 7.057 or other law," and that the charter school may not appeal the rating "in another proceeding" if the school had the opportunity to challenge the rating as provided by the Commissioner-promulgated rules.[23]

The next statutorily scheduled Sunset report on TEA, which issued in 2013 after the 2012–2013 review cycle,[24] included a comprehensive review of TEA's difficulties and failures in addressing the poor academic performance and financial mismanagement at low-performing charter schools.[25] The 2013 TEA Sunset report emphasized that, despite failing to meet required academic performance standards, poor-performing charter schools remain open, subjecting students to inadequate education, because "TEA cannot act quickly, particularly in circumstances warranting revocation."[26] The report further noted, "Revocation of a charter under the charter school statute typically takes two to three years, on top of several years of poor performance, during which time a charter school remains open"; and "A long revocation process leaves students to be educated at underperforming charter schools."[27] The report acknowledged TEA's lack of statutory authority to

---

[23] *See id.* § 39.301, 2006 Tex. Gen. Laws at 77 (current version at Tex. Educ. Code § 39.151(d), (e)). Section 7.057 allows appeals by a person "aggrieved by an action of the agency or decision of the commissioner." Tex. Educ. Code § 7.057(d).

[24] *See* Act of July 2, 2009, 81st Leg., 1st C.S., ch. 2, § 2.01, sec. 7.004, 2009 Tex. Gen. Laws 5665, 5667 (setting Sunset date of Sept. 1, 2013 for TEA).

[25] *See* Sunset Advisory Comm'n, *Final Report with Legislative Action: TEA* 69–82 (July 2013), available at https://www.sunset.texas.gov/reviews-and-reports/agencies/texas-education-agency-tea.

[26] *Id.* at 72.

[27] *Id.*

address and effectively deal with charter schools' financial accountability problems,[28] and its ultimate recommendation in this regard was legislation requiring the Commissioner to revoke the charter, without an agency hearing or any right of appeal, of any charter school that failed to meet basic academic or financial accountability standards for three years in a row.[29]

In the following legislative session, proponents of reforming the charter-school system invoked the 2013 Sunset review as having revealed "serious regulatory flaws" in TEA's governing ability and cited it in support of modifying the State's "outdated and ineffective laws governing charters" that have "created a situation where a cap [on the number of charters] prevents new high-quality schools from forming while poor performing schools are allowed to remain open."[30] Professing concern that "outdated laws and policies" governed charter schools, proponents introduced and ultimately persuaded the Legislature to enact Senate Bill 2—"a comprehensive bill to overhaul the laws relating to authorizing, governing, and establishing charter schools in Texas."[31] To address the specific problem of "many poor performing existing charters that have been able to remain open because of ineffective laws governing public charters,"[32] Senate Bill 2 included provisions, as were specifically recommended in the 2013 Sunset report, mandating that the Commissioner revoke the charters of any charter schools having "three strikes" on their

---

[28] *Id.* at 73.

[29] *Id.* at 79–80.

[30] House Comm. on Pub. Educ., Bill Analysis, Tex. S.B. 2, 83d Leg., R.S. (2013).

[31] Senate Comm. on Pub. Educ., Committee Report, Tex. S.B. 2, 83d Leg., R.S. (2013).

[32] *Id.*

accountability ratings and strictly limiting review of the Commissioner's charter revocation decisions:

**Sec. 12.115. Basis for Charter Revocation, or Modification of Governance**

. . . .

(c)      The commissioner shall revoke the charter of an open-enrollment charter school if:

> (1) the charter holder has been assigned an unacceptable performance rating under Subchapter C, Chapter 39, for the three preceding school years;
>
> (2) the charter holder has been assigned a financial accountability performance rating under Subchapter D, Chapter 39, indicating financial performance lower than satisfactory for the three preceding school years; or
>
> (3) the charter holder has been assigned any combination of the ratings described by Subdivision (1) or (2) for the three preceding school years.

(c-1)   For purposes of revocation under Subsection (c)(1), performance during the 2011–2012 school year may not be considered.  For purposes of revocation under Subsection (c)(1), the initial three school years for which performance ratings under Subchapter C, Chapter 39 [academic accreditation], shall be considered are the 2009–2010, 2010–2011, and 2012–2013 school years. For purposes of revocation under Subsection (c)(2), the initial three school years for which financial accountability performance ratings under Subchapter D, Chapter 39 [financial accountability], shall be considered are the 2010–2011, 2011–2012, and 2012–2013 school years. This subsection expires September 1, 2016.

. . . .

(g)      The commissioner shall adopt rules necessary to administer this section.

(h)      The commissioner shall adopt initial rules under Subsection (g) not later than September 1, 2014.  This subsection expires October 1, 2014.

**Sec. 12.116. Procedure for Revocation, or Modification of Governance**

(a)      The commissioner shall adopt an informal procedure to be used for revoking the charter of an open-enrollment charter school . . . as authorized by Section 12.115.

(b)      Chapter 2001, Government Code, does not apply to a procedure that is related to a revocation or modification of governance under this subchapter.

(c)      A decision by the commissioner to revoke a charter is subject to review by the State Office of Administrative Hearings. Notwithstanding Chapter 2001, Government Code:
(1) the administrative law judge shall uphold a decision by the commissioner to revoke a charter unless the judge finds the decision is arbitrary and capricious or clearly erroneous; and

(2) a decision of the administrative law judge under this subsection is final and may not be appealed.

. . . .[33]

Senate Bill 2, including sections 12.115 and 12.116, went into effect on September 1, 2013.[34]

On December 18, 2013, the Commissioner sent letters to six open-enrollment charter schools, including appellees here, that TEA had identified as meeting the criteria for mandatory charter revocation under the new legislation.[35]

---

[33] Act of May 26, 2013, 83d Leg., R.S., ch. 1140, §§ 25–26, secs. 12.115–.116, 2013 Tex. Gen. Laws 2760, 2771–73 (codified at Tex. Educ. Code §§ 12.115–.116); *see* Sunset Advisory Commission, Final Report with Legislative Action at 79.

[34] *Id.* at § 49, 2013 Tex. Gen. Laws at 2777.

[35] *See* Press Release, Texas Education Agency, "*The Texas Education Agency (TEA) has notified six open-enrollment charter schools that the revocation process of their charter—established under Senate Bill 2—will continue.*" (Feb. 10, 2014), http://tea.texas.gov/news_release.aspx?id=25769809317&ekfxmen_noscript=1&ekfxmensel=e9e debdf8_620_622) (listing schools notified in December 2013).

**B.  Appellees' charter revocations**

In his December 18, 2013 letter, the Commissioner explained to each recipient that he was revoking its open-enrollment charter (effective June 30, 2013) under section 12.115(c) of the Education Code.  He cited the performance ratings that were the basis for the recipient's charter revocation and attached exhibits corresponding to the identified ratings.  The Commissioner also noted that the identified performance ratings on which the revocations were based were "final and not appealable" because "all rights to appeal the ratings identified above had been waived or exhausted."

In these same letters, the Commissioner described the informal appeals process available to the schools slated for charter revocation:  the charter school had "the right to request an informal review of, and hearing regarding" the Commissioner's revocation decision, but "only if the charter holder submits a written request that contains specific answers to each of the findings included in this Notice."  He explained further that if the charter holder submitted a timely request that was subsequently denied during the informal review—i.e., if the Commissioner "did not change [his] decision during the informal review"—the charter school's revocation issue would be sent to the State Office of Administrative Hearings (SOAH) for a hearing under section 12.116.  Finally, the Commissioner noted that the SOAH hearing would be "limited to the specific findings and revocation detailed in this correspondence," that his decision would be upheld "unless the judge finds the decision is arbitrary and capricious or clearly erroneous," and that the SOAH judge's decision would be "final and may not be appealed."

11

### 1.      American YouthWorks[36]

The Commissioner's letter to American YouthWorks identified the following performance ratings as the basis for mandatory revocation of its charter:

- 2010–2011 academic performance rating of "AEA:[37] Academically Unacceptable";
- 2010–2011 financial accountability performance rating of "Substandard Achievement";
- 2011–2012 financial accountability performance rating of "Substandard Achievement"; and
- 2012–2013 financial accountability performance rating of "Substandard Achievement."

American YouthWorks appealed the Commissioner's revocation decision immediately, claiming that TEA had misinterpreted and misapplied the plain language of subsection (c-1); that American YouthWorks was denied due process; that revocation of its charter constitutes an unlawful taking; that TEA and the Commissioner adopted arbitrary revocation rules in violation of the APA; that the revocation decision was premature because American YouthWorks had rating appeals pending; and that sections 12.115 and 12.116 are unconstitutional.

The Commissioner notified American YouthWorks in February 2014 that, after reviewing its response to the notice of revocation and conducting an informal review, he had decided to proceed with the charter revocation and would be forwarding American YouthWorks's appeal to SOAH for a hearing as provided by section 12.116.  That appeal was scheduled for April 14, 2014.

---

[36] American YouthWorks, chartered since 1996, describes itself as a drop-out-recovery school serving "Austin's under-served and under-privileged youth, through work, work-study and work training opportunities."

[37] "AEA" stands for "alternative education accountability."  *See* Tex. Educ. Code § 39.201.

## 2. Azleway[38]

The Commissioner's revocation notice to Azleway identified the following performance ratings as the basis for mandatory revocation of its charter:

- 2010–2011 academic performance rating of "AEA: Academically Unacceptable";
- 2011–2012 financial accountability performance rating of "Substandard Achievement"; and
- 2012–2013 financial accountability performance rating of "Substandard Achievement."

Like American YouthWorks, Azleway immediately appealed the Commissioner's revocation decision, but it asserted only two challenges. First, Azleway addressed what it characterized as a mistake regarding its designation as an "alternative campus" that had affected its 2010–2011 academic accountability rating. According to Azleway, because its campuses qualify as residential treatment facilities, it was not accountable under the 2010–2011 rating system, but the Commissioner's revocation notice "still erroneously applie[d] the former rating system retroactively to Azleway Charter School for the 2010–11 school year and count[ed] that year twice to tally its three unacceptable periods to justify th[e] revocation." As its second argument, Azleway complained that TEA had "ignored" its explanation regarding an acknowledged clerical error involving Azleway's financial-accountability information that had adversely affected its rating for the 2012–2013 school year, despite later correcting the error on the TEA website.[39] The Commissioner

---

[38] Azleway, chartered since in 2001, describes itself as providing residential treatment for high-risk and addicted teens across the State, most placed there temporarily by Child Protective Services while awaiting adoption or placement in foster care.

[39] Specifically, Azleway asserted TEA inaccurately reported on its website that Azleway had defaulted on a debt, which results in an automatic "substandard achievement" rating. Azleway appealed that rating, but TEA, Azleway complains, ignored its explanation. According to TEA, Azleway's accounting methods earned it the substandard rating, not the debt-default error.

denied Azleway's appeal of his revocation decision and referred the matter to SOAH as provided by section 12.116. The SOAH hearing was scheduled for April 29, 2014.

### 3. Honors Academy[40]

The Commissioner's letter to Honors Academy identified the following performance ratings as the basis for mandatory revocation of its charter:

- 2009–2010 academic performance rating of "Academically Unacceptable";
- 2010–2011 academic performance rating of "Academically Unacceptable"; and
- 2012–2013 academic performance rating of "Improvement Required."

In its administrative appeal, Honors Academy challenged the Commissioner's interpretation of subsection (c-1) of section 12.115, which states, "For purposes of revocation under Subsection (c)(1), performance during the 2011–2012 school year may not be considered."[41] Honors Academy argued that while the plain language of subsection (c)(1) prohibits the use of any data, including student data, from the 2011–2012 school year in the revocation context, there is no dispute that TEA calculated Honors Academy's 2012–2013 academic accountability rating using student data from the 2011–2012 school year.

At the subsequent hearing before SOAH, the ALJ considered Honors Academy's arguments, but ultimately ruled that the Commissioner's revocation decision was not arbitrary, capricious, or clearly erroneous and issued an order upholding the revocation.

_____

[40] Honors Academy, which received its charter from the State in 1998, has schools located predominately in north Texas. It describes its schools as serving a large population of transient, low-income, at-risk students who have not been successful in "regular public schools."

[41] Tex. Educ. Code § 12.115(c-1).

14

## C. District-court proceedings

In 2014, before American YouthWorks' and Azleway's April-scheduled hearings before SOAH could take place, the Charter Holders filed the underlying suits in Travis County District Court. The Charter Holders sought temporary injunctive relief to halt the ongoing revocation proceedings at TEA and asserted various claims for declaratory relief under the Uniform Declaratory Judgments Act (UDJA),[42] including requests involving the construction and validity of Education Code sections 12.115 and 12.116, the validity of TEA Rule 109.1002,[43] and alleged ultra vires acts by the Commissioner. After a hearing, the district court issued two orders temporarily enjoining TEA and the Commissioner from:

- "[T]aking any further action to revoke [American YouthWorks' and Azleway's] charters until such time as th[e district court] may conduct a full trial on the merits."[44]

- "Revoking the Open-Enrollment Charter of Honors Academy or taking other action to enforce any prior order of revocation, or taking any other action to impair ongoing educational operations of Honors Academy . . . ."[45]

It is from these injunctions that TEA and the Commissioner now appeal.

---

[42] *See generally* Tex. Civ. Prac. & Rem. Code §§ 37.001–.011 (provisions of UDJA).

[43] *See* 19 Tex. Admin. Code § 109.1002 (TEA, Financial Accountability Ratings), *repealed* 40 Tex. Reg. 4876 (2015) (proposed May 22, 2015) (also adopting current version of rule, located 19 Tex. Admin. Code § 109.1001 (TEA, Financial Accountability Ratings)).

[44] Issued on May 2, 2014, this injunction is the subject of Cause No. 03-14-00283-CV.

[45] Issued on June 5, 2014, this injunction is the subject of Cause No. 03-14-00360-CV.

## II.

## Sovereign Immunity

In their interlocutory appeal, the TEA and the Commissioner complain that the district court abused its discretion in granting the temporary injunctions[46] and that sovereign immunity bars the Charter Holders' claims. Because the district court's subject-matter jurisdiction over the Charter Schools' claims, and thus ours, depends on the resolution of the sovereign-immunity issue, we begin with that issue.[47]

Absent legislative waiver, sovereign immunity deprives Texas courts of subject-matter jurisdiction over any suit against the State or its agencies or subdivisions.[48] That same immunity normally extends to Texas state officials who are sued in their official capacities, such as the Commissioner here, because that "is merely 'another way of pleading an action against

---

[46] Specifically, they assert the Charter Holders could not establish "a probable right to the relief sought." *See Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002) (three requirements for temporary injunctive relief: "a cause of action against the defendant"; "a probable right to the relief sought"; and "a probable, imminent, and irreparable injury in the interim").

[47] The State parties unsuccessfully challenged the district court's subject-matter jurisdiction over Honors Academy's claims, but did not assert the same challenge to the other Charter Holders' claims. Subject-matter jurisdiction, however, may be raised for the first time on appeal by the parties or by the court. *See Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 445–46 (Tex. 1993); *see also Rusk State Hosp. v. Black*, 392 S.W.3d 88, 94–97 (Tex. 2012) (holding defendants may bring—and courts must address—immunity-based jurisdictional challenges that are raised for the first time on appeal, even in the context of an interlocutory appeal); *Dallas Metrocare Servs. v. Juarez*, 420 S.W.3d 39, 41 (Tex. 2013) ("Under *Rusk*, an appellate court must consider all of a defendant's immunity arguments, whether the governmental entity raised other jurisdictional arguments in the trial court or none at all.").

[48] *See, e.g., Texas Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 620–21 (Tex. 2011) (per curiam).

the entity of which [the official] is an agent.'"[49] A claim seeking to require a state official to comply with statutory or constitutional provisions, however, is not prohibited by sovereign immunity.[50] Such an "ultra vires" claim must allege (and ultimately prove) that the state official, rather than the government itself, acted without legal authority or failed to perform a purely ministerial act.[51] Ultra vires claims that meet such requirements and seek only to require the state official to comply with the statutory or constitutional provisions at issue, do not implicate sovereign immunity in the first instance and, thus, are not barred even absent legislative consent.[52] But because an ultra vires suit is, for all practical purposes, against the state, remedies for such a claim are limited and, in fact, may implicate immunity.[53] Only some forms of prospective injunctive relief are allowed to remedy an ultra vires action; retrospective relief, whether monetary or otherwise, is barred.[54]

---

[49] *City of El Paso v. Heinrich*, 284 S.W.3d 366, 373 (Tex. 2009) (quoting *Texas A & M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 844 (Tex. 2007) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985))).

[50] *Heinrich*, 284 S.W.3d at 372.

[51] *Id.*

[52] *See, e.g.*, *id*. at 372–74.

[53] *See id.* at 373–74.

[54] *See id.* at 373–77 (noting exception for successful takings claim); *see also City of Dallas v. Albert*, 354 S.W.3d 368, 378–79 (Tex. 2011) ("But *Heinrich* clarified that only prospective, not retrospective, relief is available in an ultra vires claim." (citing *id.* at 376)); *Texas Logos, L.P. v. Dep't of Transp.*, 241 S.W.3d 105, 119–20 (Tex. App.—Austin 2007, no pet.) (holding that sovereign immunity barred ultra vires claim seeking to invalidate previously executed state contract because that remedy was retrospective in nature).

The doctrine of sovereign immunity derives from the common law and has long been part of Texas jurisprudence.[55] Sovereign immunity in Texas embodies two concepts: immunity from liability and immunity from suit.[56] Immunity from liability protects governmental entities from judgments, while immunity from suit completely bars actions against those entities unless the Legislature expressly consents to suit.[57] "Simply described, sovereign immunity generally shields our state government's 'improvident acts'—however improvident, harsh, unjust, or infuriatingly boneheaded these acts may seem—against the litigation and judicial remedies that would be available if the same acts were committed by private persons."[58]

These sovereign-immunity concepts apply in the administrative context as well because, like other suits against the government, a suit challenging a specific administrative order also seeks to control state action—it seeks to restrain the state or its officials in the exercise

---

[55] *Rusk*, 392 S.W.3d at 93 (citing *Hosner v. DeYoung*, 1 Tex. 764, 769 (1847) (holding that the State could not be sued in her own courts absent her consent "and then only in the manner indicated")); *see Albert*, 354 S.W.3d at 373 ("[The] boundaries [of sovereign immunity] are established by the judiciary, but we have consistently held that waivers of it are the prerogative of the Legislature.").

[56] *Rusk*, 392 S.W.3d at 93 (citing *Albert*, 354 S.W.3d at 373).

[57] *Id.* (citing *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 374 (Tex. 2006); *Tooke v. City of Mexia*, 197 S.W.3d 325, 332 (Tex. 2006) ("[I]mmunity from suit ... bars suit against [a governmental] entity altogether."); *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 696 (Tex. 2003) ("Unlike immunity from suit, immunity from liability does not affect a court's jurisdiction to hear a case and cannot be raised in a plea to the jurisdiction."); *Texas Nat. Res. Conservation Comm'n v. IT–Davy*, 74 S.W.3d 849, 857 (Tex. 2002) ("We again reaffirm that it is the Legislature's sole province to waive or abrogate sovereign immunity."); *Texas Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex. 1999) (per curiam)).

[58] *Bacon v. Texas Historical Comm'n*, 411 S.W.3d 161, 173 (Tex. App.—Austin 2013, no pet.) (citing *Tooke*, 197 S.W.3d at 331–32 (quoted for same proposition in *Houston Belt & Terminal Ry. Co. v. City of Houston*, __ S.W.3d __, No. 14-0459, 2016 WL 1312910, at *1 (Tex. Apr. 1, 2016))).

18

of discretionary statutory or constitutional authority. Thus, such actions, including the underlying actions here, are barred absent legislative waiver or allegations of unconstitutionality or ultra vires acts.[59] Or as stated by the Texas Supreme Court, "It is well recognized under Texas law that there is no right to judicial review of an administrative order unless a statute provides a right or unless the order adversely affects a vested property right or otherwise violates a constitutional right."[60] Although the Charter Holders seem to disagree, not only does the Education Code not provide for judicial review of the Commissioner's revocation decision or for a review of the accountability decisions on which the revocation decision itself is predicated, Chapter 12 expressly *prohibits* judicial review of either of those decisions.[61] Thus, the Charter Holders here are limited to asserting the type of claims described above that are said to invoke the trial court's "inherent jurisdiction" to protect against agency action that is unconstitutional or ultra vires of the agency's authority.[62]

---

[59] *See Creedmoor-Maha Water Supply Corp. v. Texas Comm'n on Envtl. Quality*, 307 S.W.3d 505, 514–15 (Tex. App.—Austin 2010, no pet.) (citing *Texas Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 198 (Tex. 2004) (acknowledging that statutory right to judicial review of administrative decisions waives sovereign immunity against such suits); *cf. Texas Highway Comm'n v. Texas Ass'n of Steel Importers, Inc.*, 372 S.W.2d 525, 530 (Tex. 1963) (suit challenging void administrative order is not suit against State)).

[60] *Continental Cas. Ins. Co. v. Functional Restoration Assocs.*, 19 S.W.3d 393, 397 (Tex. 2000) (citing *Stone v. Texas Liquor Control Bd.*, 417 S.W.2d 385, 385–86 (Tex. 1967)).

[61] *See* Tex. Educ. Code §§ 12.116(c) (ALJ review of Commissioner's revocation decision is "final and may not be appealed"), (d) (providing that Commissioner's decision on challenge to performance rating is final and "may not be appealed under section 7.057 or other law"), (e) (prohibiting charter school from challenging performance rating "in another proceeding" if it had opportunity to challenge it under this section).

[62] *See Creedmoor-Maha*, 307 S.W.3d at 515 (citing *Southwestern Bell Tel. Co. v. Public Util. Comm'n*, 735 S.W.2d 663, 668 (Tex. App.—Austin 1987, no writ)).

Our review of the sovereign-immunity issues in this appeal are under the same standard by which we review subject-matter jurisdiction generally.[63] That standard requires the pleader—here, the Charter Holders—to allege facts that affirmatively demonstrate the trial court's jurisdiction to hear the cause.[64] Whether the pleader has met this burden is a question of law.[65] We construe the pleadings liberally and look to the pleader's intent.[66] Additionally, because we are considering subject-matter jurisdiction for the first time on appeal rather than reviewing a trial-court order granting or denying a plea to the jurisdiction, we must review the entire record to determine if any evidence supports jurisdiction.[67] Here, although certain jurisdictional facts may overlap with the merits, none of those facts, material or otherwise, are disputed by the parties. As such, we are presented solely with questions of law on the jurisdictional issues.[68]

If the pleadings do not contain sufficient facts to affirmatively demonstrate the trial court's jurisdiction but do not affirmatively demonstrate incurable defects in jurisdiction,

---

[63] *Texas Ass'n of Bus.*, 852 S.W.2d at 446; *see Hendee v. Dewhurst*, 228 S.W.3d 354, 375 (Tex. App.—Austin 2007, pet. denied) (noting limits of appellate court's sua sponte review of subject-matter jurisdiction, including that it adhere to jurisdictional review as set forth in *Texas Department of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 227–28 (Tex. 2004)).

[64] *See Miranda*, 133 S.W.3d at 226 (citing *Texas Ass'n of Bus.*, 852 S.W.2d at 446); *Hendee*, 228 S.W.3d at 375.

[65] *Miranda*, 133 S.W.3d at 226.

[66] *Id.*

[67] *See Texas Ass'n of Bus.*, 852 S.W.2d at 446; *Hendee*, 228 S.W.3d at 375–78 (citing *Miranda*, 133 S.W.3d at 227–28).

[68] *Hendee*, 228 S.W.3d at 375 (noting concerns associated with challenging subject-matter jurisdiction for first time on appeal); *see Miranda*, 133 S.W.3d at 227 (holding that where relevant evidence is undisputed or fails to raise fact question on jurisdictional issue, court rules on jurisdiction as matter of law).

the issue is one of pleading sufficiency and the plaintiffs should be afforded the opportunity to amend.[69] If the pleadings affirmatively negate the existence of jurisdiction, we may render judgment dismissing the plaintiffs' case without an opportunity to amend.[70]

In their live pleadings to the district court, the Charter Holders asserted multiple requests for declaratory relief that can be fairly divided into four types of claims: (1) challenges to the constitutionality of Education Code sections 12.115 and 12.116; (2) requests for statutory interpretation and declaration of rights as to those same and related Code provisions; (3) challenges to the validity of TEA Rule 109.1002; and (4) various ultra vires claims.[71] The Charter Holders brought all of their claims under the UDJA.

The UDJA waives sovereign immunity for certain claims, including challenges to the validity of a statute or ordinance, but it is not a general waiver of sovereign immunity.[72] However, the UDJA does not create or augment subject-matter jurisdiction—it merely provides a remedy where subject-matter jurisdiction already exists.[73] And "a litigant's couching its requested relief in

---

[69] *See Miranda*, 133 S.W.3d at 226–27.

[70] *Id.* at 227.

[71] Not all of the described claims were asserted by each of the Charter Holders, but for clarity we will address each claim without regard to its proponent because such distinctions do not affect our disposition.

[72] *Texas Parks & Wildlife Dep't v. Sawyer Trust*, 354 S.W.3d 384, 388 (Tex. 2011) (citing Tex. Civ. Prac. & Rem. Code § 37.006(b); *Heinrich*, 284 S.W.3d at 373 n.6 (noting that the UDJA waives immunity for claims challenging the validity of ordinances or statutes); *IT–Davy*, 74 S.W.3d at 855–56).

[73] *See* Tex. Civ. Prac. & Rem. Code § 37.003(a) ("A court of record *within its jurisdiction* has power to declare rights, status, and other legal relations . . . .") (emphasis added); *Sefzik*, 355 S.W.3d at 622 (citing *Sawyer Trust*, 354 S.W.3d at 388; *Texas Ass'n of Bus.*, 852 S.W.2d at 444).

21

terms of declaratory relief does not alter the underlying nature of the suit."[74] As such, sovereign immunity will bar an otherwise proper UDJA claim that has the effect of establishing a right of relief against the State for which the Legislature has not waived sovereign immunity.[75] Stated in terms applicable here, to the extent their claims suffer from any sovereign-immunity defects, the Charter Holders cannot avoid those problems merely by asserting UDJA claims and purporting to request only declaratory relief. Similarly, the Charter Holders' ultra vires claims must allege facts showing that a state actor acted without legal authority or failed to perform a purely ministerial act and, further, must not seek remedies that would implicate sovereign immunity.[76]

With these sovereign-immunity concepts in mind, we turn now to the Charter Holders' claims.

## A. Constitutional-validity claims

The Legislature has expressly waived the state's immunity from suit for UDJA actions challenging the validity of a statute.[77] The Charter Holders have collectively pleaded two statutory-validity claims that they maintain qualify under this waiver of immunity. First, they assert that subsections (c) and (c-1) of Education Code section 12.115 violate the Texas Constitution

---

[74] *Sawyer Trust*, 354 S.W.3d at 388 (citing *Heinrich*, 284 S.W.3d at 370–71; *IT–Davy*, 74 S.W.3d at 844).

[75] *Id.* (citing *City of Houston v. Williams*, 216 S.W.3d 827, 828–29 (Tex. 2007) (per curiam)).

[76] *See, e.g.*, *Heinrich*, 284 S.W.3d at 372.

[77] *Sefzik*, 355 S.W.3d at 622 & n.3 (citing Tex. Civ. Prac. & Rem. Code § 37.006(b)); *Heinrich*, 284 S.W.3d at 373 & n.6; *Wichita Falls State Hosp.*, 106 S.W.3d at 697–98; *Texas Educ. Agency v. Leeper*, 893 S.W.2d 432, 446 (Tex. 1994)).

because they operate as a retroactive law or impair the obligation of contracts, namely the charters granted to the Charter Holders by the State.[78] Second, the Charter Holders assert that sections 12.115 and 12.116, operating together, violate the Texas Constitution by depriving the Charter Holders of their property—again, alleged property interests in their charters—without due process of law.[79] To the extent that these constitutional claims are viable, they are not barred by sovereign immunity.[80] We determine a claim's viability by considering the Charter Holders' pleadings in their favor and, if necessary, reviewing the entire record to determine if any evidence supports subject-matter jurisdiction.[81]

        The TEA and the Commissioner assert that the Charter Holders' due-process and retroactivity claims are not viable because the Charter Holders have no vested rights in their charters. The Charter Holders disagree, emphasizing that TEA's own general counsel has recognized a charter holder's vested interest in its charter; charter schools usually own pre-charter assets that would likely

---

[78] *See* Tex. Const. art. I, § 16 ("No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made.").

[79] *See id.* art. I, § 19 ("No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land.").

[80] *See* Tex. Civ. Prac. & Rem. Code § 37.004(a) ("A person . . . whose rights, status, or other legal relations are affected by a statute . . . may have determined any question of construction or validity arising under the . . . statute . . . and obtain a declaration of rights, status, or other legal relations thereunder."); *Andrade v. NAACP of Austin*, 345 S.W.3d 1, 11 (Tex. 2011) (considering substance of equal-protection claim in plea-to-jurisdiction context and explaining that secretary of state retained immunity from suit unless plaintiffs pleaded "viable claim")); *cf. Patel v. Texas Dep't of Licensing & Regulation*, 469 S.W.3d 69, 11–12 (Tex. 2015) (rejecting State's argument that plaintiffs had to prove merits of claims to survive plea to jurisdiction and holding that because plaintiffs' "pleadings presented a viable claim, they were sufficient" to negate sovereign immunity).

[81] *See Miranda*, 133 S.W.3d at 226; *Texas Ass'n of Bus.*, 852 S.W.2d at 445–46; *Hendee*, 228 S.W.3d at 375.

be acquired by TEA upon charter revocation; and charter schools often acquire financial obligations, grants, and other funds based on their charters. The Charter Holders also contend that, regardless, the Texas Supreme Court's 2010 decision in *Robinson v. Crown Cork & Seal Co.*,[82] has eliminated the dispositive effect of vested rights in a retroactivity claim and replaced it with a balancing test that the legislation at issue here cannot survive. While we agree that *Robinson* rejected the traditional "impairs-vested-rights" analysis for retroactivity claims, it did not eliminate the requirement for a constitutionally protected property interest, which is at the heart of retroactivity and due-process claims.[83] As we explain below, the Charter Holders do not have a constitutionally protected property interest in the continuation of their charters.

For due-process claims, the necessary property interest is the traditional "vested right"—"Before any substantive or procedural due-process rights attach," a petitioner "must have a liberty or property interest that is entitled to constitutional protection," and that "constitutionally protected right must be a vested right."[84] Historically, that same lack of vested interest was likewise fatal to a retroactivity claim: "Laws are deemed retrospective and within the constitutional prohibition, which by retrospective operation, destroy or impair vested rights."[85] But, as noted, *Robinson* rejected the traditional "impairs-vested-rights" analysis for retroactivity claims and

---

[82] 335 S.W.3d 126 (Tex. 2010).

[83] *See id.*

[84] *Klumb*, 458 S.W.3d at 15 (citing *University of Tex. Med. Sch. v. Than*, 901 S.W.2d 926, 929 (Tex. 1995)).

[85] *DeCordova v. City of Galveston*, 4 Tex. 470, 479 (1849); *see Robinson*, 335 S.W.3d at 139–46 (collecting Texas Supreme Court cases, including *id.*, that applied "impairs vested rights" analysis in determining constitutionality of retroactive statutes).

substituted in its place a balancing test that requires courts to consider (1) "the nature and strength of the public interest served by the statute as evidenced by the Legislature's factual findings"; (2) "the nature of the prior right impaired by the statute"; and (3) "the extent of the impairment."[86] Thus, as seen in the second factor, while a vested right may no longer be required, retroactivity claims, like due-process claims and takings claims, must still be founded on an underlying property interest.

"Property" in the constitutional sense is a label applied to a benefit when an individual possesses a "legitimate entitlement" to the benefit under "existing rules or understandings."[87] These "rules" and "understandings" arise from sources independent of the Constitution, such as state statutes, the common law, and contracts.[88] When these sources secure certain benefits and support claims of entitlement to those benefits—i.e., provide an individual with a "legitimate entitlement" to a benefit, not merely an abstract need or desire for the benefit or a unilateral expectation of the benefit—the Constitution recognizes the benefit as "property" worthy of constitutional protection.[89] By way of example, a written contract with an explicit tenure provision could be evidence of a formal understanding that would support a teacher's claim of

---

[86] *Robinson*, 335 S.W.3d at 145; *see Union Carbide Corp. v. Synatzske*, 438 S.W.3d 39, 56 (Tex. 2014) ("We determined [in *Robinson*] that classifying a right or interest as 'vested' in order to determine whether it has been retroactively diminished or impaired in violation of the constitution has not yielded an efficient and predictable framework." (citing *Id.* at 145)).

[87] *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 779–80 (1980) (due process); *Goss v. Lopez*, 419 U.S. 565, 573–74 (1975) (due process).

[88] *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972) (due process).

[89] *Id.*

entitlement to continued employment unless sufficient cause is shown.[90] Conversely, an untenured professor would have no claim of entitlement to re-employment after his one-year employment contract expired by its own terms.[91]

The Charter Holders' assertion of a constitutionally protected property interest in their State-granted charters—i.e., a legitimate entitlement to the charter based on existing law or understanding—is not supported by the Education Code or the undisputed terms of their respective charters. To the contrary, specific provisions found in each of the charters and a provision the Education Code conclusively negate any such possible property interest.

Under long-established Supreme Court jurisprudence, a benefit is not a protected entitlement if government officials may grant or deny it in their discretion.[92] "Some substantive limit on the State's discretion is an essential characteristic of a property interest warranting constitutional protection."[93] The charters here each include provisions that explicitly acknowledge and agree to the State's unlimited discretion over the charters. For example, in accepting TEA's renewal of its charter in 2007, Azleway, Inc., agreed as follows:

> [T]he [charter] may be modified or even terminated by future legislative act. Furthermore, state and federal laws and rules may periodically be adopted, amended, or repealed and all such changes applicable to the charter holder or its charter school(s) may modify this [charter] as of the effective date provided in the law or

---

[90] *See id.*; *Perry v. Sindermann*, 408 U.S. 593, 601 (1972) (due process).

[91] *See Roth*, 408 U.S. at 578.

[92] *See, e.g.*, *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) (due process (citing *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 462–63 (1989)).

[93] *Grounds v. Tolar Indep. Sch. Dist.*, 856 S.W.2d 417, 418 (Tex. 1993) (due process) (citing *Cain v. Larson*, 879 F.2d 1424, 1426 (7th Cir. 1989) cert. denied, 493 U.S. 992).

rule. Nothing in this [charter] shall be construed to entitle the charter holder to any privilege or benefit, including any funding, but in accordance with state and federal laws in effect and as they may in the future be amended. A [charter] term that conflicts with any state or federal law or rule is superseded by the law or rule to the extent that the law or rule conflicts with the [charter] term.

Similarly, both American YouthWorks and Honors Academy agree in their charters that the terms of the charters include "applicable law" and "any condition, amendment, modification, revision or other change to the charter adopted or ratified by the [Texas State] Board [of Education]."[94] Morever, section 12.071 of the Education Code stipulates that a charter holder who accepts any state funding after the effective date of a provision in subchapter 12 (relating to open-enrollment charter schools), "agrees to be subject to that provision, regardless of the date on which the charter holder's charter was granted."[95] In sum, these charter provisions and section 12.071 give the State "unfettered discretion" over the charters at issue here. As such, even if we could determine that some other state law or understanding provided the Charter Holders with a legitimate entitlement to their charters, which we do not do here, these provisions render any such interest entirely contingent on State discretion,[96] and thus not entitled to constitutional protection.[97]

---

[94] *See* Tex. Educ. Code § 7.102(c)(9) (listing among State Board of Education's powers and duties "grant[ing] and open-enrollment charter or approv[ing] a charter revision as provided" by statute).

[95] *Id.* § 12.1071(a).

[96] *See, e.g.*, *Dames & Moore v. Regan*, 453 U.S. 654, 673 (1981) (holding that government's reservation of right to amend, modify, or revoke license put party on notice of "the contingent nature of its interest").

[97] *See, e.g.*, *Town of Castle Rock*, 545 U.S. at 756–57 ("Our cases recognize that a benefit is not a protected entitlement if government officials may grant or deny it in their discretion."); *Roth*, 408 U.S. at 567 (holding that untenured professor whose one-year contract had expired had no right to continued employment where university had "unfettered discretion" over decision to rehire);

27

Even if we were to assume that the Charter Holders have some constitutionally protected interest in their State-granted charters, however, their due-process and retroactivity claims would still not be viable on the undisputed facts here. First, the Charter Holders do not allege facts that would construe a denial of due process. At a minimum, due process requires that "deprivation of life, liberty or property by adjudication 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'"[98] "This principle requires 'some kind of hearing'" before the deprivation or "some pretermination opportunity to respond"—i.e., "to present reasons, either in person or in writing, why proposed action should not be taken."[99] However, "the pretermination 'hearing,' though necessary, need not be elaborate" depending on "'the importance of the interests involved and the nature of the subsequent proceedings.'"[100] Further, the pretermination hearing "need not definitively resolve the propriety of the discharge," but it

---

*KEM Texas, Ltd. v. Texas Dep't of Transp.*, No. 03-08-00468-CV, 2009 WL 1811102, at *6 (Tex. App.—Austin June 26, 2009, no pet.) (mem. op.) (holding that because right to erect or maintain outdoor advertising was contingent on obtaining license, plaintiff's rights under billboard easement were merely expectations of a potential and contingent interest (i.e., not vested) and, thus, not entitled to due process); *Lee v. Texas Workers' Comp. Comm'n*, 272 S.W.3d 806, 817–18 (Tex. App.—Austin 2008, no pet.) (relying on *Town of Castle Rock* to hold doctor had no interest in continued inclusion on approved doctor list where state had unlimited discretion over list); *cf. Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 11–12 (1978) (holding that customers had constitutionally protected interest in utility service where state statute prohibited utilities from terminating without cause).

[98] *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)).

[99] *Id.* (quoting *Roth*, 408 U.S. at 569–70).

[100] *Id.* (quoting *Boddie v. Connecticut*, 401 U.S. 371, 378 (1971)).

"should be an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges . . . are true and support the proposed action."[101]

The Charter Holders each had the opportunity to, and did, contest the adverse ratings determinations on which the revocation decision was based when those ratings were issued. Moreover, each Charter School was allowed to, and did, challenge the Commissioner's revocation decision, first to the Commissioner and then to SOAH. The Charter Holders complain that the appeal of an adverse financial rating is unfairly (and arbitrarily) limited to challenging "a data error solely attributable to the TEA's review of the data for any of the indicators,"[102] but that limitation is logical given that the ratings result from a score that is based on the answers supplied in response to multiple objective questions, which in turn, reflect "financial measurements, ratios, other indicators established by the commissioner."[103]

As for the revocation decision, section 12.116 requires the Commissioner to establish an "informal procedure" that "must allow a representative of the charter holder to meet with the Commissioner to discuss the Commissioner's decision and must allow the charter holder to submit additional information to the commissioner relating to the Commissioner's decision," and that the Commissioner must provide a written response.[104] If the Commissioner denies the informal appeal,

---

[101] *Id.* (citing *Bell v. Burson*, 402 U.S. 535, 540 (1971)).

[102] 19 Tex. Admin. Code § 109.1002(i)(2).

[103] *See id.* § 109.1002(a)–(g). For the fiscal year 2010–2011, for example, the form ask yes-or-no questions such as "Were There No Disclosures In The Annual Financial Report And/Or Other Sources Of Information Concerning Default On Bonded Indebtedness Obligations?" and "Was The Administrative Cost Ratio Less Than The Threshold Ratio?" and assigns points depending on the answer. *See id.* § 109.1002(g).

[104] *See* Tex. Educ. Code § 12.116(a)–(a-1).

the charter holder is then entitled to an appeal to SOAH.[105]  Each of the Charter Schools participated

in this appeal process.  In sum, a charter school identified for revocation under section 12.115 has

the pre-revocation opportunity to be heard at least three times regarding a challenge to the ratings

that are the basis for the revocation decision, and two times regarding a challenge to the revocation

decision itself.  As such, the Charter Holders had the "opportunity to be heard 'at a meaningful time

and in a meaningful manner'" that due process requires.[106]

As for their retroactivity claims—again assuming the existence of a property

interest—the challenged statutory provisions at issue here would survive *Robinson*'s balancing test.

Any interest the Charter Holders might be deemed to have in their charters would be far from

the "firmly vested" interest the plaintiffs in *Robinson* had in their personal-injury claims.[107]  In fact,

given that open-enrollment charters lack, among other traditional attributes of property,

transferability and are subject to numerous conditions and discretionary control by the State,[108] it is

difficult to describe them as property at all.  Further, Education Code sections 12.115 and 12.116

---

[105]  *See id.* § 12.116(c).

[106]  *See Matthews v. Eldridge*, 424 U.S. 319, 333 (1976) ("The fundamental requirement of
due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"
(quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965))); *see id.* at 333–34 (collecting cases as to
what procedures constitute appropriate due process).

[107]  *See Robinson*, 335 S.W.3d at 148.

[108]  *See, e.g.*, *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*,
527 U.S. 666, 672 (1999) (considering, for the first time in due-process analysis, the "right to
exclude" stick of property rights:  "The hallmark of a protected property interest is the right to
exclude others."); *see also* Thomas W. Merrill, *Property and the Right to Exclude*, 77 Neb. L. Rev.
730 (1998) (describing various "sticks" including in bundles of property rights and positing that
"right to exclude," which necessarily includes the right to transfer the property, is the sine qua non
of property rights).

serve an unarguably compelling public purpose—Texas's interest in ensuring that its citizens are educated.[109] Both the legislative history in the record and the plain meaning of these provisions evidence that the Legislature's purpose in amending sections 12.115 and 12.116 was to empower the Commissioner to revoke the charters of underperforming charter schools in an efficient and timely manner, with limited agency review and no judicial review,[110] in service of the compelling state interest.[111]

We hold that the Charter Holders' constitutional claims challenging Education Code sections 12.115 and 12.116 are not viable as a matter of law and, as such, are barred by sovereign immunity.

---

[109] *See Robinson*, 335 S.W.3d at 146 (requiring courts to consider public interest served by legislation being challenged); *see also* Tex. Const. art. VII, § 1 ("A general diffusion of knowledge being essential to the preservation of the liberties and rights of the people, it shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintenance of an efficient system of public free schools."); *Wisconsin v. Yoder*, 406 U.S. 205, 221 (1972) (accepting as compelling state interest Thomas Jefferson's proposition "that some degree of education is necessary to prepare citizens to participate effectively and intelligently in our open political system if we are to preserve freedom and independence," and further that, "education prepares individuals to be self-reliant and self-sufficient participants in society").

[110] *See* Tex. Educ. Code §§ 12.115(c), (c-1), .116.

[111] The Charter Holders correctly point out that the legislation at issue here does not include any of the factual findings seemingly required by this prong of the *Robinson* test: "the nature and strength of the public interest served by the statute *as evidenced by* the Legislature's factual findings." But in its actual application of the test, the supreme court willingly considered not only the entire legislative record, but additional facts such as similar legislation as adopted in other states. *See Robinson*, 335 S.W.3d at 145 (emphasis added). We also find it at least noteworthy that the source of the court's three-part balancing test—*The Supreme Court and the Constitutionality of Retroactive Legislation* by Charles B. Hochman—does not require legislative fact findings regarding "the nature and strength of the public interest served by the statute," but only the factor itself. *See* 73 Harv. L. Rev. 692, 697 (1960).

## B. Statutory-construction and declaration-of-rights claims

In their second group of UDJA claims, the Charter Holders ask the district court to interpret different provisions of the Education Code and make declarations regarding the court's interpretations. For example, asserting that Education Code sections 39.152 and 12.116 conflict, the Charter Holders ask for an interpretation and declaration as to which of the two applies to charter-revocation proceedings.[112] The Charter Holders also seek an interpretation of section 12.115(c-1) and a declaration that the Legislature's intent in promulgating that provision was that a charter school's performance rating for any given school year be based solely on data from that same school year. In support of the court's jurisdiction over these claims, the Charter Holders rely on the same UDJA provision that the supreme court has held waives sovereign immunity for statutory-validity claims, i.e., section 37.004(a). However, as the supreme court explained in *Sefzik*, unlike the waiver for validity claims, "the UDJA does not waive the state's sovereign immunity when the plaintiff seeks a declaration of his or her rights under a statute or other law."[113] Accordingly, the Charter Holders' claims requesting statutory construction and a declaration of rights are barred by sovereign immunity. Nevertheless, to the extent it is possible to recast these as ultra vires claims, we will do so and address them in our analysis of the Charter Holders' pleaded ultra vires claims.[114]

---

[112] *See* Tex. Educ. Code §§ 12.116 (providing that SOAH uphold Commissioner's revocation decision unless it is "arbitrary and capricious or clearly erroneous"), 39.152(a) (providing that SOAH review Commissioner's decision to close open-enrollment charter school under APA's "substantial evidence rule").

[113] 355 S.W.3d at 622 (citing *Heinrich*, 284 S.W.3d at 372–73).

[114] *See id.* ("Very likely, the same claim [for a declaration of rights under a statute] could be brought against the appropriate state official under the *ultra vires* exception, but the state agency remains immune."); *see also Koseoglu*, 233 S.W.3d at 839–40 (plaintiff should be allowed opportunity to amend pleadings if jurisdictional defects can be cured).

## C. Ultra vires claims

As for their ultra vires claims, the Charter Holders assert that the Commissioner acted without legal authority when he violated—

- section 12.115(c-1) by using, as a basis for charter revocation, accountability ratings that were established using data from the 2011–2012 school year;

- section 12.115(c) by using, as a basis for charter revocation, accountability ratings that were established using data from a year(s) other than the year to which the accountability rating is assigned;

- section 12.116(c) by denying the charter schools the right to challenge the accuracy, legitimacy, and validity of the underlying accountability ratings;

- section 39.055 by not exempting Azleway from the accountability standards as a residential treatment facility;

- section 12.115(g) by initiating charter-revocation proceedings before adopting rules to administer those proceedings;

- section 12.116(a) by failing to provide reasonable notice of the "informal procedure" to be used in the charter-revocation process; and

- section 39.152 by following, in the charter-revocation process, the review set forth under section 12.116 rather than that provided by section 39.152.

In addition to the above claims, the Charter Holders also assert that SOAH acted ultra vires by denying the Charter Schools the right to challenge the "accuracy, legitimacy, and validity" of the underlying accountability ratings in violation of section 12.116(c).[115]

---

[115] This allegation is based on an ALJ order limiting the scope of the case and related discovery in Honors Academy's administrative appeal of the Commissioner's revocation decision. That order stated that the "case does not encompass a review of the correctness of any performance rating" and that section "12.116(c) does not give the ALJ jurisdiction to consider whether an underlying performance rating was correctly determined." The ALJ concluded by determining that "the correctness of the underlying performance ratings previously assigned . . . is not relevant" and denied discovery on that issue.

Assuming without deciding that the above are properly pleaded ultra vires claims, they are all nevertheless barred by sovereign immunity because they seek or would require forms of relief that are retrospective in nature and, thus, impermissible.[116]  Although the Charter Holders disagree, asserting that their claims seek "review, interpretation, and invalidation" of only "future revocation appeals," the actual relief they seek—ultimately that their charters not be revoked under this particular revocation decision, but also that they be allowed to challenge past accountability ratings on which that decision was based—necessarily requires somehow undoing or changing prior acts or events.  The Charter Holders' first four claims, as listed above, and the claim ostensibly directed at SOAH, would require changing—either by granting an additional review of the performance ratings or, in at least one instance, actually awarding a different performance rating—the Charter Schools' past performance ratings in the hope that the rating change would remove the school(s) from the mandatory revocation list.  This is the necessary relief sought here because, unless the prior unacceptable or unsatisfactory performance ratings were to change, the Charter Schools remain subject to mandatory revocation under section 12.115 the same as they did in mid-December 2013—"The commissioner *shall revoke* the charter of an open-enrollment charter school if the . . . charter holder has been assigned" unacceptable or unsatisfactory performance ratings for the three preceding school years.[117]

---

[116]  *See Heinrich*, 284 S.W.3d at 376 (holding that ultra vires claimant was entitled to prospective relief only because retrospective relief is barred by sovereign immunity); *Texas Logos, L.P.*, 241 S.W.3d at 119–20 (holding that sovereign immunity barred ultra vires claim seeking to invalidate previously executed state contract because that remedy was retrospective in nature).

[117]  *See* Tex. Educ. Code § 12.115(c) (emphasis added).

The Charter Holders' remaining three claims challenging the Commissioner's charter-revocation process similarly seek to undo or rewind, as it were, an already-ongoing process, including the Commissioner's revocation decisions and informal review affirming those decisions. Although the Charter Holders urge that such relief would not undo any *final* decision in this instance because (at least in the cases of American YouthWorks and Azleway) there has been no SOAH review of the Commissioner's decision, the simple fact is that the only judicial action that would effect the relief sought is a judgment reversing the Commissioner's revocation decision or TEA's actions, or one ordering the Commissioner to reverse his decision and TEA to reverse its actions to allow the Charter Holders to redo the entire charter-revocation process. As emphasized, the Education Code does not allow for this type of review. Further, we cannot think of, and the Charter Holders have not articulated, any prospective declaratory relief that would have any effect on their charter revocation.[118]

In a final group of what they characterize as "ultra vires" claims, the Charter Holders allege that the Commissioner acted beyond his statutory authority in promulgating TEA Rule 109.1002 because that rule impermissibly restricts the review process for accountability ratings that is statutorily available under the Education Code.[119] These assertions by the Charter Holders, however, are not in the nature of ultra vires claims. The gravamen of the complaints is not that the

---

[118] *See Heinrich*, 284 S.W.3d at 376 (noting that prospective declaratory relief is permitted for ultra vires claims, while retrospective relief is beyond the scope of the ultra vires exception and, thus, barred by sovereign immunity); *Texas Logos, L.P.*, 241 S.W.3d at 119–20 (same).

[119] The Charter Holders also assert that the TEA and Rule 109.1002 "are ultra vires," but because ultra vires claims must be directed at a state official, *see Heinrich*, 284 S.W.3d at 262, we will recast the Charter Holders' allegations here to the extent possible and consider them in appropriate contexts as required by our standard of review. *See Miranda*, 133 S.W.3d at 226–28 (we construe the pleadings liberally in the plaintiffs' favor).

Commissioner exceeded his authority in promulgating Rule 109.1002—he had the authority to do so under the very statutes the Charter Holders assert the rule violates.[120] Rather, the Charter Holders' actual complaint is that the rule as promulgated violates the statutes under which it was authorized. Accordingly, we will also consider these claims under our discussion of the Charter Holders' other rule challenges below.[121]

As ultra vires claims, the Charter Holders' "rule challenges" fail because, quite simply, the UDJA does not waive sovereign immunity for rule challenges, only challenges to statutes and municipal ordinances.[122] Regardless of that limitation, however, their claims also fail for the same reason their other "ultra vires" claims did, namely that they seek relief that is retrospective in nature.[123] The Charter Holders' chief complaint is that the rule impermissibly restricts the review process for accountability ratings that is statutorily available under the Education Code.[124] As relief,

---

[120]   *See* Tex. Educ. Code § 39.151(a) ("The commissioner by rule shall provide a process for a . . . charter school to challenge an . . . accountability rating . . . ."); *see also id.* § 39.082(b) ("The system must include uniform indicators adopted by commissioner rule . . . .").

[121]   *See Miranda*, 133 S.W.3d at 226–28 (we construe pleadings liberally in plaintiffs' favor).

[122]   *See* Tex. Civ. Prac. & Rem. Code § 37.004 ("A person . . . whose rights, statute, or other legal relations are affected by a *statute* [or] *municipal ordinance* . . . .") (emphasis added); *Texas State Bd. of Veterinary Med. Exam'rs v. Giggleman*, 408 S.W.3d 696, 708 (Tex. App.—Austin 2013, no pet.).

[123]   *See Heinrich*, 284 S.W.3d at 376.

[124]   *See* 19 Tex. Admin. Code § 109.1002.  For example, the Charter Holders assert that (1) subsection (i)(2)'s limit to an appeal of a performance rating "based on a data error solely attributable to the TEA's review of the date for any of the indicators," *id.* § 109.1001(i)(2), violates section 39.151's directive that a charter school may raise "any issue" it identifies on appeal, *see* Tex. Educ. Code § 39.151 ("The commissioner may limit a challenge under this section to a written submission of any issue identified by the school district or open-enrollment charter school challenging the agency decision."); and (2) the worksheet accompanying Rule 109.1002 violates

the Charter Holders' pleadings seek to have their already-determined and now-final accountability ratings changed or rendered null and void. But, as we explained above, the district court could not undo, change, or render "null and void" the Charter Schools' final accountability ratings that were previously reached under this rule, nor would the district court have jurisdiction to "permit [them] to appeal," as they have asked, those final accountability ratings since that would be the same as authorizing a change to the ratings. Similarly, as will be discussed in more detail below, a prospective declaration that this rule is invalid and enjoining its further enforcement[125] would not have any legal effect on the Charter Schools' already *final* accountability ratings.

## D. Rule challenge

In their remaining category of claims, the Charter Holders assert rule challenges under APA section 2001.038, which authorizes declaratory actions to determine "the validity or applicability of a rule."[126] The Charter Holders assert that TEA Rule 109.1002 is invalid because it was not promulgated in compliance with the APA's rulemaking provisions[127] and because it violates two provisions of the Education Code: section 39.151's mandate that charter schools

---

section 39.082's requirement that the Commissioner use, among other things, "uniform indicators" to "measure the financial management performance and future financial solvency," Tex. Educ. Code § 39.082.

[125] *See Heinrich*, 284 S.W.3d at 373–77 (only prospective injunctive relief available for ultra vires claims).

[126] Tex. Gov't Code § 2001.038(a).

[127] The Charter Holders do not provide any specific factual assertions regarding this allegation.

have an opportunity to appeal accountability ratings in a specific manner;[128] and section 39.082's

requirement that the accountability rating system use "uniform indicators . . . to measure the financial

management performance and future financial solvency" of a charter school.[129]

Section 2001.038 waives sovereign immunity for challenges to the validity and

applicability of agency rules if the rule or its threatened application interferes with or impairs a

legal right or privilege of the plaintiff.[130] However, like any other cause of action, section 2001.038

requires the existence of a justiciable controversy to establish subject-matter jurisdiction.[131] In the

underlying case, the district court does not have jurisdiction to determine whether Rule 109.1002 is

valid or applicable—the *only* two decisions over which it would have subject-matter jurisdiction

under section 2001.038[132]—because neither of those two determinations, or an order enjoining the

---

[128]  *See* Tex. Educ. Code § 39.151.

[129]  *See* Tex. Educ. Code § 39.082.

[130]  *See* Tex. Gov't Code § 2001.038(a); *Slay v. Texas Comm'n on Envtl. Quality*, 351 S.W.3d 532, 544 (Tex. App.—Austin 2011, pet. denied) ("In APA section 2001.038, the Legislature has waived sovereign immunity to the extent of creating a cause of action for declaratory relief regarding the "validity" or "applicability" of a "rule," as defined under the Act, if "it is alleged that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff." (citing *Texas Logos, L.P.*, 241 S.W.3d at 123 (holding that "section 2001.038 is a grant of original jurisdiction and, moreover, waives sovereign immunity")); *see also Sefzik*, 355 S.W.3d at 622 (noting possibility that 2001.038 waives sovereign immunity, but declining to address issue given there was no rule at issue in case).

[131]  *See Texas Logos, L.P.*, 241 S.W.3d at 123–24; *see also Friends of Canyon Lake, Inc. v. Guadalupe-Blanco River Auth.*, 96 S.W.3d 519, 528 (Tex. App.—Austin 2002, pet. denied) (district court lacked subject-matter jurisdiction over section 2001.038 rule challenge where underlying controversy had been extinguished by plaintiff's failure to exhaust administrative remedies).

[132]  *See* Tex. Gov't Gode § 2001.038 (authorizing challenge to "validity" or "applicability" of rule); *Friends of Canyon Lake*, 96 S.W.3d at 529.

rule's enforcement, would have any legal effect on the already-final and unappealable (and, in fact, statutorily free from judicial review) accountability ratings of the Charter Schools.[133] Stated another way, any justiciable controversy regarding Rule 109.1002 and the Charter Schools' accountability ratings—either standing alone or in the context of the revocation proceedings—was rendered moot when those ratings became final and unappealable.[134] A decision determining that Rule 109.1002 is invalid and enjoining its further enforcement would not benefit appellees.

## E. Section 7.057(d)

In a final argument that touches upon many of the issues and claims addressed above, American YouthWorks asserts that the Legislature expressly waived sovereign immunity for each of its claims against TEA and the Commissioner under section 7.057 of the Education Code, which provides that "[a] person aggrieved by an action of the agency or decision of the commissioner may appeal to a district court in Travis County."[135] Specifically, American YouthWorks asserts that the revocation of its charter is a "decision of the commissioner" and any limitations on judicial review established by section 12.116 do not apply because it has not yet appealed that decision to SOAH under section 12.116—i.e., it is not a final agency order. American YouthWorks also asserts, using

---

[133] *See Creedmoor-Maha*, 307 S.W.3d at 526 & n.16 (noting that TCEQ's final, unappealable order rendered moot any possible claims under section 2001.038 (citing *KEM Texas, Ltd.*, 2009 WL 1811102, at *6 n.6) (citing *Friends of Canyon Lake*, 96 S.W.3d at 528–29))); *Texas Logos, L.P.*, 241 S.W.3d at 123–24 (holding that 2001.038 claim was barred because only available relief, invalidating rule, would have no effect on the underlying controversy).

[134] *See Creedmoor-Maha*, 307 S.W.3d at 526 & n.16; *Friends of Canyon Lake*, 96 S.W.3d at 528–29.

[135] Tex. Educ. Code § 7.057(d).

similar logic, that section 7.057 authorizes judicial review of its performance ratings because those ratings are "an action of the agency" that they are "aggrieved by."[136]  We disagree.

Regardless of section 7.057's prior effect, the plain language of section 12.116 prohibits judicial review of the Commissioner's charter-revocation decisions.[137]  Accordingly, absent viable constitutional or ultra vires claims, the Charter Holders have no right to appeal the Commissioner's revocation decision.[138]  Further, American YouthWorks's reading of section 7.057 is overly broad.  These types of jurisdictional statutes must be construed in the context of long-established limitations on the judicial review of agency orders.[139]  For example, in *Sun Oil Co. v. Railroad Commission*, the supreme court faced similar statutory language that purported to grant a right to appeal from "any decision, rate, charge, rule, order, act, or regulation" of an agency.[140]

---

[136]  *Id.*

[137]  *See id.* § 12.116(c) (providing that SOAH's review of Commissioner's revocation decision is final and not appealable); *see also, e.g.*, *Hallmark Mktg. Co. v. Hegar*, __S.W.3d__, No. 14-1075, 2016 WL 1516774, at *4 (Tex. Apr. 15, 2016) ("If we perceived a conflict among these provisions we would be forced to conclude the more specific section [] controls over the more general provisions relied on by the comptroller." (citing *Texas Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 639 (Tex. 2010)); *Railroad Comm'n v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 628 (Tex. 2011) ("We ordinarily construe a statute so as to give effect to the Legislature's intent as expressed in its plain language.").

[138]  *See, e.g.*, *Houston Mun. Emps. Pension Sys. v. Ferrell*, 248 S.W.3d 151, 158–59 (Tex. 2007) (holding that where act expressly denies right to appeal, party may appeal only where administrative action complained of violates constitution).

[139]  *See, e.g.*, *Texas Comm'n on Envt'l Quality v. Bonser-Lain*, 438 S.W.3d 887, 894–95 (Tex. App.—Austin 2014, no pet.) ("As Texas courts have repeatedly held, section 5.351 of the Water Code must be construed in the context of longstanding jurisdictional limitations on judicial review of agency orders." (citing *In re Texas Water Comm'n v. Dellana*, 849 S.W.2d 808, 809–10 (Tex. 1993); *City of Austin v. Texas Comm'n on Envtl. Quality*, 303 S.W.3d 379, 385 (Tex. App.—Austin 2009, no pet.)).

[140]  *Sun Oil Co. v. Railroad Commission*, 311 S.W.2d 235, 236 n.1 (Tex. 1958).

After noting that such language "would, literally speaking, permit [] an appeal from anything whatever that the Commission might do or not do," the court nevertheless limited the grant of jurisdiction to final agency orders because the language was "undoubtedly not intended to be free of all limitation."[141] Likewise, Texas courts have limited section 5.351 of the Water Code, which appears similarly broad,[142] to the review of "final agency orders" and to administrative actions that are regulatory in nature and only upon the exhaustion of all administrative remedies.[143] Based on the Legislature's clear prohibition on judicial review of the Commissioner's revocation decision and on these well-established jurisdictional principles, we hold that section 7.057 does not grant the review American YouthWorks seeks here.

The Charter Holders have failed to affirmatively allege facts that invoke the district court's inherent jurisdiction to protect against ultra vires or unconstitutional agency actions.[144] Further, we are not aware of any way in which they could cure these jurisdictional defects through repleading[145] and, in fact, their pleadings and the undisputed jurisdictional evidence affirmatively negate the facts required to plead and support their constitutional and ultra vires

---

[141] *Id.* at 236.

[142] Tex. Water Code § 5.351(a) ("A person affected by a ruling, order, decision, or other act of the commission may file a petition to review, set aside, modify, or suspend the act of the commission.").

[143] *See, e.g.*, *Bonser-Lain*, 438 S.W.3d at 894 (citing *IT–Davy*, 74 S.W.3d at 859; *In re Texas Water Comm'n*, 849 S.W.2d at 809–10; *City of Austin*, 303 S.W.3d at 385)).

[144] *See Miranda*, 133 S.W.3d at 226–28.

[145] *See Koseoglu*, 233 S.W.3d at 839–40 (noting that opportunity to cure pleading defect is available only if it is possible to cure defect).

claims.[146]  Accordingly, the Charter Holders' claims are barred by sovereign immunity.  Having so determined, we need not address the State Parties' challenge to the temporary injunctions.

## III.

## CONCLUSION

Because the district court lacked subject-matter jurisdiction over the Charter Holders' claims, we vacate the district court's orders granting the temporary injunctions, dissolve the temporary injunctions, and render judgment dismissing the Charter Holders' suits for want of jurisdiction.

_____
Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Pemberton and Field

Vacated and Rendered

Filed:  June 10, 2016

---

[146] *See Miranda*, 133 S.W.3d at 227 (if pleadings affirmatively negate existence of jurisdiction, then plea to the jurisdiction may be granted without allowing opportunity to amend).