COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| MIKE MORATH, COMMISSIONER OF EDUCATION, in his Official Capacity, and TEXAS EDUCATION AGENCY, | § § § | No. 08-20-00152-CV Appeal from the |
| Appellants, | § | 353rd District Court |
| v. | § | of Travis County, Texas |
| TEXAS AMERICAN FEDERATION OF TEACHERS and TEXAS STATE TEACHERS ASSOCIATION, | § | (TC# D-1-GN-18-005044) |
| Appellees. | § | |

## O P I N I O N

The Texas Legislature amended the Texas Education Code in 2017 to incentivize local school districts to address underperforming school campuses. *See* TEX.EDUC.CODE ANN. § 11.174 (a)-(n).[1] The enactment authorized local school districts to run underperforming schools with a charter school partner either previously approved by the Texas Education Agency (TEA), or eligible to be so approved. If they did so, the local school districts could avoid sanctions, and would be entitled for additional funding. The statute authorized the Commissioner for the TEA to adopt rules to administer that section. The Commissioner then promulgated three rules at issue here, which respectively address: (1) consulting with, and preserving the existing contract rights

---

[1] Act of May 26, 2017, 85th Leg., R.S., ch. 953, §1, 2017 Tex.Gen.Laws 3814 (codified at TEX.EDUC.CODE ANN. § 11.174).

of teachers and staff at the affected schools; (2) exempting the contracting partner from existing local policies and rules; and (3) the appealability of the Commissioner's approval (or disapproval) of partnering agreements. Two teacher organizations challenged the validity of these administrative rules in a declaratory judgment action, contending the Commissioner exceeded his authority in promulgating the rules. The trial court agreed with the teacher groups and invalidated the rules. We reverse as to the first two challenged rules but affirm as to the third.[2]

## I. BACKGROUND

### A. Charter Schools in Texas

The Texas Legislature declared the purpose of charter schools is to "(1) improve student learning; (2) increase the choice of learning opportunities within the public school system; (3) create professional opportunities that will attract new teachers to the public school system; (4) establish a new form of accountability for public schools; and (5) encourage different and innovative learning methods." TEX.EDUC.CODE ANN. § 12.001. Charter schools are principally governed by Chapter 12 of the Education Code. *Id*. § 12.001 et. seq. That chapter delineates three types of charter schools: local school district approved campus or campus programs (under Subchapter C), TEA approved open-enrollment charters (under Subchapter D), and home-rule school districts. *Id*. § 12.002. Only the first two types of charter schools are at issue here.[3]

---

[2] This case was transferred to this Court from the Third Court of Appeals pursuant to the Texas Supreme Court's on-going docket equalization efforts. We follow Third Court of Appeals precedent to the extent that they conflict with our own. TEX.R.APP.P. 41.3

[3] The third type--home rule school districts--describe a scenario the legislature authorized in 1995 legislation whereby a local electorate could vote to take over an existing traditional school district, thereby implementing a new model of school governance. TEX.EDUC.CODE ANN. §§ 12.011-12.030. But no home rule district has to our research ever been established in Texas.

2

Under Subchapter C, a local district approved "campus or campus program charter" describes a charter school created with the approval of the board of trustees of a local school district. This kind of charter school can originate in several ways. The local district's board of trustees might approve a qualifying petition signed by a majority of an existing school campus's parents and classroom teachers. *Id.* § 12.052(a); *see also* § 12.053 (allowing two or more campuses to similarly file a petition). Or the district itself might choose to organize a *new* campus as a charter, or have a public or private entity run a program on an existing campus. *Id.* § 12.0521. Or a district might convert its lowest performing campus to a charter school, subject to a cap on the number of students that can be enrolled at such schools. *Id*. § 12.0522(b) and (c) (limiting charters under this subsection to serving no more than 15% of the district's student enrollment).

If granted a charter, the local school board must enter a performance contract with the "principal or equivalent chief operating officer of the campus or program" that identifies the academic goals and the authority granted to meet those goals. *Id.* § 12.0531. A Subchapter C charter expires in ten years unless the specified goals are substantially met. *Id.*

By contrast, under Subchapter D, the charter for an "open-enrollment charter" school is granted by the TEA through an approval process involving both the Commissioner and the State Board of Education. *Id.* § 12.101(b). Open-enrollment charters are typically held, and the schools run by, nonprofit corporations qualifying under § 501(c)(3) of the Internal Revenue Code, or less commonly, by "institution[s] of higher education,"[4] "private or independent institution[s] of higher education,"[5] or governmental entities. *See id.* § 12.101(a)(3); *see also Honors Acad., Inc. v. Texas*

---

[4] Defined to mean "any public technical institute, public junior college, public senior college or university, medical or dental unit, public state college, or other agency of higher education[.]" TEX.EDUC.CODE ANN. § 61.003(8).

[5] Defined to include private or independent colleges or universities that are organized as non-profit corporations, exempt from taxations, and accredited by one of three designated organizations. *Id.* § 61.003(15).

*Educ. Agency*, 555 S.W.3d 54, 57 (Tex. 2018). By statute, the Commissioner must thoroughly investigate and evaluate the applicant's ability to meet financial, governing, educational, and operational standards set by the Commissioner. TEX.EDUC.CODE ANN. § 12.101(b). Subchapter D also sets out a comprehensive set for standards that applicants must abide by. *See id.* §§ 12.103-12.306. As discussed below, those legislatively designated standards exceed the legislatively required standards for Subchapter C charters.

An open-enrollment charter is initially limited to five years. *Id.* § 12.101(b-5). The Commissioner also is limited in the number of open-enrollment charters that may be granted in a given year. *Id.* § 12.101(b-1).

## B. The Texas Legislature Addresses Underperforming Schools

By statute, the Commissioner each year is charged with assessing the accreditation status of each school district, deciding if it is "accredited," "accredited-warned," "accredited-probation," or whether it deserves revocation of its accreditation status and ordered closed. *Id.* §§ 39.051, 39.052(c)(1)(2). Performance criteria are outlined by statute and set by the Commissioner. *E.g. id.* §§ 39.023, 39.034, 39.053; *see also Honors Acad.*, 555 S.W.3d at 68-69 (summarizing performance and financial accountability standards). A school district's performance "may be lowered based on the performance of one or more campuses in the district that is below a standard required under this subchapter." TEX.EDUC.CODE ANN. § 39.052(d). For instance, the Commissioner also has adopted rules to evaluate and assign overall performance ratings of A, B, C, D, or F to each school district and campus. *Id.* § 39.054 (a).[6] A district may not receive a

---

[6] Consistent with most grading systems, a rating of "A" reflects exemplary performance, "B" reflects recognized performance, "C" reflects acceptable performance, "D" reflects performance that needs improvement and "F" reflects unacceptable performance. *Id.* § 39.054 (a).

performance rating of "A" if the district includes any campus with a corresponding rating of "D" or "F." *Id.* § 39.054.

And with failure, comes consequences. The Commissioner is charged with the responsibility to take actions in the face of a school district that does not satisfy accreditation, academic performance, or financial accountability standards. *See id*. § 39A.001. The Commissioner is similarly charged with addressing underperforming campuses. *See id.* § 39A.051 (general obligation to take authorized actions for campuses not meeting State standards); § 39A.101 (obligation to implement a turnaround plan for campus given "unacceptable" rating for two consecutive school years); § 39A.107 (if the Commissioner does not approve a campus turnaround plan, the Commissioner may appoint a board of managers to govern the school, or close the campus); § 39A.111 (if an approved turnaround plan is unsuccessful, the Commissioner shall order appointment of board of managers or closure of campus).

However, a school district can avoid accountability sanctions, and even receive additional funding, by agreeing to partner with and operate an underperforming campus through a charter school partner:

> (a)  A school district campus qualifies for an exemption from intervention as provided by Subsection (f) and qualifies for funding as provided by Section 48.252 if the board of trustees of the district contracts to partner to operate the district campus as provided by this section with:
>
>> (1) the governing body of an open-enrollment charter school; or
>>
>> (2) on approval by the commissioner, an entity granted a charter by the district under Subchapter C, Chapter 12, that is eligible to be awarded a charter under section 12.101(a).

TEX.EDUC.CODE ANN. § 11.174(a). That is, a local school district can choose between a Subchapter D open-enrollment charter school under subsection 11.174(a)(1), or a Subchapter C campus or campus program charter under subsection 11.174(a)(2) as its partner. As a shorthand reference, we refer to these as the "(a)(1)" and "(a)(2)" options.

5

But this partnering option under section 11.174 is only available for a district campus that has received an overall "unacceptable" performance rating for the preceding year. *Id.* § 11.174(f). Subsections (b) through (n) of section 11.174 contain other restrictions on the eligible campuses and chartering entities, as well as conditions for the transitioning process. The several provisions contemplate that the school district will enter a performance contract with the partnering entity. *See* § 11.174(a), (c), (e), (f), (h)-(k). Additionally, subsection (m) provides that the Commissioner may "adopt rules as necessary to administer this section, including requirements for an entity and the contract with the entity, including the standards required for an entity to receive approval under Subsection (a)(2)." *Id.* § 11.174(m).

**C. The Texas Education Agency Enacts Rules Implementing Section 11.174**

In implementing section 11.174, the Commissioner adopted Rule 97.1075 which contains eleven subparts addressing the performance contract. 19 TEX.ADMIN.CODE § 97.1075(d)(1)-(11). Two subparts of that rule are at issue in this appeal. The Commissioner also adopted Rule 97.1079 that addresses the application and approval process for an (a)(2) entity partner. *Id.* § 97.1079. One subpart of that rule is at issue here. We give each subpart the short-hand name used by the parties here.

*1. The Consultation Rule*

The "Consultation Rule" states that any performance contract between the school district and its operating partner must include:

> [A]n assurance that the district has consulted with campus personnel regarding the provisions included in the performance contract and that the rights and protections afforded by current employment contracts or agreements shall not be affected by this contract as required by TEC, §11.174(c), unless the district is partnering with an entity described in TEC, §11.174(a)(2).

6

19 TEX.ADMIN.CODE § 97.1075(d)(10).  To be clear, while the parties refer to this as the "Consultation Rule," much of the dispute is focused on the preservation of employees' existing contract rights with an (a)(2) partnering entity.

### 2. *The Local Policy Rule*

The "Local Policy Rule" requires that the performance contract include:

> [A] contract term stating that the campus is exempt from laws and rules to the fullest extent allowed by TEC, Chapter 12, Subchapter C, and is exempt from all district policies except for laws, rules, and policies that are specifically identified as applicable to the campus in the performance contract.

19 TEX.ADMIN.CODE § 97.1075(d)(6).  As explained below, the dispute over this rule hinges on whether the Commissioner was authorized to require a contract term that exempts all laws, rules, and policies *unless* they are identified in the performance contract, or instead, whether the contract *must expressly identify* any exempted laws, rules, or policies.

### 3. *The Final Decision Rule*

Under the statute, the Commissioner must approve an (a)(2) partner.  TEX.EDUC.CODE ANN. § 11.174(a)(2).  Rule 97.1079 details how a school district might seek to qualify an (a)(2) entity as a contracting partner with the Commissioner.  Part of that rule makes the Commissioner's decision in that regard final:

> Decision finality.  The approval or denial of the eligibility approval request is a final administrative decision by the commissioner and not subject to appeal under TEC, §7.057.

19 TEX.ADMIN.CODE § 97.1079(f).[7]

---

[7] The trial court's order actually voids 97.1079(e).  As a result of subsequent amendments, 97.1079(e) now appears as subsection (f) in the current version of section 97.1079, and we cite to the current location of the rule.  There was no textual change in the rule itself.

### D. The Proceedings Below

The Texas American Federation of Teachers and the Texas State Teachers Association (collectively "Appellees") filed suit against the TEA and its Commissioner in his official capacity. *See* TEX.GOV'T CODE ANN. § 2001.038 (permitting a declaratory relief action to challenge the validity of an agency rule). The suit alleges a facial challenge to the three rules set out above, claiming that the TEA and its Commissioner exceeded their rule making authority in adopting the three rules. Both sides filed competing motions for summary judgment. The trial court granted Appellees' motion and declared the rules invalid. This appeal follows.

## II. STANDARD OF REVIEW

The TEA and its Commissioner raise three issues on appeal, each directed at the respective challenged rules, contending the rules were a valid exercise of the Commissioner's statutory rule-making authority. To establish a rule's facial invalidity, the challenger must show that the agency rule: (1) contravenes specific statutory language; (2) is counter to the statute's general objectives; or (3) imposes additional burdens, conditions, or restrictions in excess of or inconsistent with the relevant statutory provisions. *See Harlingen Family Dentistry, P.C. v. Texas Health & Human Servs. Comm'n*, 452 S.W.3d 479, 482 (Tex.App.--Austin 2014, pet. dism'd); *State of Texas Office of Pub. Util. Counsel v. Public Util. Comm'n of Texas*, 131 S.W.3d 314, 321 (Tex.App.--Austin 2004, pet. denied).

We presume that an agency rule is valid, and the party challenging the rule carries the burden of demonstrating its invalidity. *See Texas Ass'n of Psychological Assocs. v. Texas State Bd. of Exam'rs of Psychologists*, 439 S.W.3d 597, 603 (Tex.App.--Austin 2014, no pet.). Yet an agency's rules must comport with the agency's authorizing statute. *Harlingen Family Dentistry*, 452 S.W.3d at 481. A state administrative agency has only the authority expressly provided by

8

statute or necessarily implied for it to carry out the express powers the legislature has given it. *See Public Util. Comm'n of Texas v. City Pub. Serv. Bd. of San Antonio*, 53 S.W.3d 310, 315 (Tex. 2001); *Public Util. Comm'n of Texas v. GTE-Southwest, Inc.*, 901 S.W.2d 401, 407 (Tex. 1995). Nor may an agency exercise what is effectively a new power on the theory that such exercise is expedient for the agency's purposes. *GTE-Southwest*, 901 S.W.2d at 407.

The issues here call upon us to review the Education Code. Statutory construction presents a question of law that we review de novo. *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006); *Texas Ass'n of Psychological Associates*, 439 S.W.3d at 602-03. Our primary objective in statutory construction is to give effect to the legislature's intent. *Shumake*, 199 S.W.3d at 284. The plain meaning of the text is the best expression of legislative intent unless a different meaning is supplied by legislative definition or is apparent from the context, or unless the plain meaning would lead to absurd or nonsensical results that the legislature could not have intended. *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625-26 (Tex. 2008); *see* TEX.GOV'T CODE § 311.011 ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage."). We consider the statute as a whole, and not just its isolated provisions. *Harlingen Family Dentistry*, 452 S.W.3d at 481-82. A court must also presume that the legislature chose its language with care, and that it included (or omitted) each word purposefully. *See id.* Finally, a statute is presumed to have been enacted by the legislature with complete knowledge of the existing law and with reference to it. *See Acker v. Texas Water Comm'n*, 790 S.W.2d 299, 301 (Tex. 1990).

## III. Discussion

### A. The Consultation Rule

The Consultation Rule requires a school district to consult with a school's existing staff and protect their contractual rights if the partnering entity is an (a)(1) partner, but not an (a)(2) partner. 19 TEX.ADMIN.CODE § 97.1075(d)(10). The Commissioner contends this dichotomy in its rule flows directly from the statute itself. Subsection 11.174(c) states:

> Before entering into a contract as provided by this section, a school district must consult with campus personnel regarding the provisions to be included in the contract between the school district and the *open-enrollment* charter school. All rights and protections afforded by current employment contracts or agreements may not be affected by the contract entered into between a school district and an *open-enrollment* charter school under this section.

TEX.EDUC.CODE ANN. § 11.174(c) (emphasis supplied). The text of the Commissioner's rule thus tracks the statutory language of subsection 11.174(c) *if* the legislature truly drew a distinction between (a)(1) open-enrollment charter schools and (a)(2) district approved campus charter partners.

The TEA points out that section 11.174 draws that distinction at several places, most notably in subsection 11.174(a) itself that expressly permits a partnering contract with either:

> (1) the governing body of an *open-enrollment* charter school; *or*
>
> (2) on approval by the commissioner, an *entity granted a charter by the district under Subchapter C*, Chapter 12, that is eligible to be awarded a charter under Section 12.101(a).

*Id.* § 11.174(a) (emphasis supplied). Additionally, subsection (b) defines disqualifying events for potential charter partners. Subsection (b)(1) and (2) address disqualifications for certain "open-enrollment charter" partners, while (b)(3) separately addresses disqualifications for "a district authorized charter" that has previously run an open-enrollment charter that was revoked or surrendered. *Id.* § 11.174(b)(1-3).

Further, subsection (h) requires the contract between the school district and "the governing body of an open-enrollment charter school" include a provision addressing student eligibility for enrollment; that provision does not mention (a)(2) district granted charters. Conversely, subsection (j) applies to an "entity granted a district-authorized charter" and addresses eligibility for the Teacher Retirement System of Texas, while not mentioning (a)(1) open-enrollment charters. Subsection (l) requires that "[e]xcept as expressly provided by this section, the commissioner may not impose additional requirements on an open-enrollment charter school to be eligible for a contract under Subsection (a)," again without reference to (a)(2) district granted charters. And subsection (m), when addressing Commissioner adopted rules, includes by example "standards required for an entity to receive approval under Subsection (a)(2)." Each of these subsections reflect the legislature drew distinctions between Chapter C district charters and Chapter D open enrollment charter schools when it enacted section 11.174.

Moreover, there must be a distinction between (a)(1) and (a)(2) charters for subsections (l) and (m) to make any sense. Subsection (m) allows the Commissioner to adopt rules, "including requirements for an entity and the contract with the entity, including the standards required for an entity to receive approval under Subsection (a)(2)." But subsection (l) states that the Commissioner "may not impose additional requirements on an open-enrollment charter school to be eligible for a contract under Subsection (a)." If all (a)(2) charters become "open enrollment" charters, then the express authorization for the Commissioner to promulgate standards for (a)(2) charters would conflict with the express prohibition from the Commissioner imposing additional requirements on open enrollment charters.

We are not the first court to confront this issue. When the San Antonio Independent School District was faced with an underperforming elementary school in 2018, it partnered with an (a)(2)

11

entity to operate the campus. *Martinez v. San Antonio All. of Teachers and Support Personnel*, No. 04-18-00421-CV, 2019 WL 1548431, at \*1 (Tex.App.--San Antonio Apr. 10, 2019, pet. denied) (mem. op.). A teachers' group filed suit against the school district's board members, claiming they acted *ultra vires* in failing to consult with them before entering the contract. *Id.* The board members argued in part that they acted in conformity with the statute (and thus were not acting *ultra vires*) because the consultation requirement only applied to (a)(1) open-enrollment charter schools, and not (a)(2) campus charters, such as the one that had entered the partnering contract.

Our sister court agreed with the school board members, noting that subsection 11.174(a) allows partnering contracts with two different classes of charters, and the consultation provision in "section 11.174(c) refers to only one of those classes[.]" The court concluded "the clear text of the statute supports the position of [the defendants] that the legislature intended to require consultation under subsection 11.174(c) only if the contract is between a school district and an open-enrollment charter school." *Martinez*, 2019 WL 1548431, at \*3, *citing Entergy Gulf States, Inc.*, 282 S.W.3d at 437 ("Where text is clear, text is determinative of [legislative] intent."). Based on this holding, the court concluded that none of the defendants acted illegally in failing to consult with the school staff on the partnership agreement with an (a)(2) charter partner. To be sure, *Martinez* was not a challenge to the Commissioner's rules, but it directly construed subsection 11.174(c) upon which the Commissioner's rule is principally based. Appellees acknowledge the relevance of the case's holding but contend that *Martinez* was incorrectly decided. They ask us to construe subsection 11.174(c) in a way that makes both (a)(1) and (a)(2) charter partners subject to the consultation obligation, even though subsection 11.174(c) only refers to open-enrollment

12

charters.  In support of that claim Appellees raise a series of arguments, some of which were expressly addressed and rejected in *Martinez.*

First, Appellees contend that the distinction between Subchapter D open-enrollment charter schools and Subchapter C district granted charter schools under section 11.174 is blurred by section 12.0522.  All charter schools must operate under a charter, *LTTS Charter School, Inc. v. C2 Construction, Inc.*, 342 S.W.3d 73, 81 (Tex. 2011), and subsection 11.174(d) provides that any "district campus must be granted a charter under Subchapter C, Chapter 12."  Found within Subchapter C is section 12.0522 that governs charters created to address underperforming campuses.  Subsection 12.0522(d) further states that "Subchapter D applies to a campus granted a district charter under this section as though the campus were granted a charter under Subchapter D, *and the campus is considered an open-enrollment charter school*." *Id*. (emphasis supplied).  Appellees thus claim that all (a)(2) charter partners must pass through section 12.0522, which in turn deems them open-enrollment charter schools.  Ergo, (a)(2) charters must also be considered (a)(1) open-enrollment charters.

But section 12.0522 applies to only one class of Subchapter C charters.  *Id*.  There are four distinct provisions that describe how a Subchapter C charter school can be formed:  section 12.052 (by petition signed by majority of parents and teachers), section 12.053 (by petition signed by majority of parents and teachers at two or more campuses); section 12.0521 (a new campus or a program at an existing campus); and section 12.0522 (taking over the lowest performing school in a district).  Subsection 12.0522(d) itself states it applies to a district charter granted "under this section[.]"  Accordingly, subsection 12.0522(d) does not apply to all Subchapter C campus or campus program charters, and cannot by itself destroy the distinctions made in section 11.174 between open-enrollment and campus or campus program charters.  *See Martinez*, 2019 WL

1548431, at *3 (rejecting similar subsection 12.0522(d) argument because section 11.174, as the more specific statutory provision, controls).[8]

Somewhat aligned with this argument, Appellees also contend that if section 12.0552 only applies to a smaller subset of (a)(2) campus charters, then the Commissioner's rule should have said "unless the district is partnering with an entity described in TEC, §11.174(a)(2) *that was not granted a charter under Section 12.0552(d)."* *Appellees Brief at p. 25.* Regardless of whether that additional verbiage would make the rule more precise, in this facial challenge to the rule, we are most concerned if the Commissioner's rule "contravenes specific statutory language" or runs "counter to the statute's general objectives" or "imposes additional burdens, conditions, or restrictions in excess of or inconsistent with the relevant statutory provisions." *Harlingen Family Dentistry*, 452 S.W.3d at 482. Viewed against that test, the more relevant inquiry would be why the legislature in enacting subsection 11.174(a)(2) did not specifically reference section 12.0552 if it intended to convert all (a)(2) charters into open enrollment charters as Appellees contend.

There is another problem with the argument. If section 12.0552 treats Subchapter C charters as Subchapter D open enrollment charters, which set of regulations govern the charter? Subchapter C and D draw sharp contrasts between how TEA approved "open-enrollment charters" and local school board approved "campus or campus program charters" are regulated. For example, a Subchapter C charter by statute is subject to ten specified statutory provisions covering matters such as special education, bilingual education, and extracurricular activities. *Id.*

---

[8] There is some overlap between sections 11.174 and 12.0522, because both address a charter taking over an underperforming school campus. But the overlap is not coterminous because under section 12.0522, a school district is limited to using charter partners to reach no more than 15% of the total student population. By contrast, section 11.174 does not incorporate that pupil limit. In that way, section 11.174 can be broader than section 12.0522. But in some ways, section 12.0522 can be broader, because section 11.174 applies only to a campus that has received an overall unacceptable rating in "the school year before operation of the district campus under the contract began." *Id.* § 11.174(f). By contrast, section 12.0522 has no date requirement on when the unacceptable rating is assessed. *Id.* § 12.0522.

14

§ 12.056(b)(2)(A)-(J). Open-enrollment charters under Subchapter D are subject to the same ten provisions, *plus* ten additional provisions. *Id*. § 12.104(3)(A)-(S). Subchapter C charters by statute must address seven specified topics, such as the program to be offered, the governing structure of the campus, and annual audits. *Id*. § 12.059(1)-(7). By contrast, the charter for an open-enrollment charter by statute must address the same seven topics, plus nine additional items (some with subparts). *Id.* § 12.111(a)(1)-(16). Subchapter D also imposes a host of other specific requirements on open-enrollment charters for which is no Subchapter C counterpart.[9] And some of the provisions governing Subchapter C charters and Subchapter D open enrollment charters directly conflict. For instance, a Subchapter C charter is good for ten years, while a Subchapter D open enrollment charter for five years. *See Id.* § 12.0531 (Subchapter C charter expiration); § 12.101(b-5) (open enrollment charter expiration). If section 12.0522 truly folds Subchapter C charters into Subchapter D open enrollment charters, why would the legislature have crafted a different regulatory scheme for each type of charter?

---

[9] Subchapter D imposes these restrictions on open-enrollment charters that have no Subchapter C counterpart:
- treated as governmental body for purposes of open meetings laws (TEX.EDUC.CODE ANN. § 12.1051);
- restrictions on nepotism (*Id*. § 12.1055 (a));
- restrictions on tuition and fees (*Id*. § 12.108);
- requirements for transportation of students (*Id*. § 12.109);
- TEC authority to audit records of school, charter holder, and management company (*Id*. § 12.1163);
- requirements for filing financial reports for school, related parties, governing body and administrator of the school (*Id*. § 12.1168);
- requirements for admission applications and practices (*Id*. § 12.117 and § 12.1173);
- requirements for filing of corporate documents with the Commissioner (*Id*. § 12.119);
- requirements for school's internet website (*Id*. § 12.1211 and. § 12.136);
- training rules for officers and members of governing body (*Id*. § 12.123);
- restrictions on acceptance of loans (*Id*. § 12.124);
- requirement to segregate management company records (*Id*. § 12.125);
- liability of damages by management company (*Id*. § 12.127);
- amounts owed to State on winding up affairs of closed charter school (*Id*. § 12.1284);
- educational requirements for principal or teacher (*Id*. § 12.129);
- obligation to provide parents with written notice of the qualifications of each teacher employed by the school (*Id*. § 12.130):
- code of conduct requirements (*Id*. § 12.131);
- minimum salary provisions (*Id*. §12.133)

15

Appellees also find ambiguity in several subsections of section of 11.174 because some use the term "open-enrollment" charter schools or "district-authorized charter" while others explicitly refer to (a)(2) charters.  *Cf.* § 11.174(k) and (m)(using (a)(2) references) *with* § 11.174(j) (using entity granted "district-authorized charter").   From the usage of the different terms, Appellees argue that had the legislature meant to draw a sharp contrast between (a)(1) and (a)(2) charters in subsection 11.174(c), it would have used those same terms throughout section 11.174. Using consistent terms to refer to an object, entity, or concept, of course greatly enhances the clarity of a writing.  But the legislature's choice to use different, but well understood synonyms for the same term does not create ambiguity where none otherwise exists.  And even if there was ambiguity in the usage of "(a)(1)/(a)(2)" versus "open-enrollment/district-authorized charter" versus "Subchapter C/Subchapter D," that ambiguity would only lead us back to another concept of agency law:

> If a statute is ambiguous—i.e., there is more than one reasonable interpretation—we give "serious consideration" to the construction of the statute by the administrative agency charged with its enforcement, "so long as the construction is reasonable and does not conflict with the statute's language."

*Texas Assn. of Acupuncture and Oriental Med. v. Texas Bd. of Chiropractic Examiners*, 524 S.W.3d 734, 738-39 (Tex.App.--Austin 2017, no pet.), *quoting Railroad Comm'n v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 628-30 (Tex. 2011); *see also Davis v. Morath*, No. 19-1035, 2021 WL 2172533, at *4 (Tex. May 28, 2021) (stating same).  That limited deference is accorded an agency because the legislature "intends an agency created to centralize expertise in a certain regulatory area be given a large degree of latitude in the methods it uses to accomplish its regulation function."  *City of Garland v. Public Utility Comm'n. of Texas*, 165 S.W.3d 814, 819 (Tex.App.--Austin 2005, pet. denied).

16

The Appellees also point to indicia of legislative history, namely statements of representatives, as subsection 11.174(c) wound its way through the legislative process. The same arguments were raised in *Martinez* and rejected by the court because "[l]egislative history . . . 'cannot be used to alter or disregard the express terms of a code provision when its meaning is clear from the code when considered in its entirety.'" *Martinez*, 2019 WL 1548431, at *4, *quoting Fleming Foods of Texas, Inc. v. Rylander*, 6 S.W.3d 278, 284 (Tex. 1999). Nor are statements of individual legislators "evidence of the collective intent of the majorities of both legislative chambers that enacted a statute." *Molinet v. Kimbrell*, 356 S.W.3d 407, 414 (Tex. 2011); *see also Texas Health Presbyterian Hosp. of Denton v. D.A.*, 569 S.W.3d 126, 136-37 (Tex. 2018) ("An individual legislator's statements—even those of the bill's author or sponsor—do not and cannot describe the understandings, intentions, or motives of the many other legislators who vote in favor of a bill.").

Next, Appellees ask us to consider the policy implications of a dual system where (a)(1) open-enrollment charter partners must protect existing employees contract rights, but (a)(2) district authorized charters do not. Appellees contend this dichotomy portends an absurd result that betrays the underlying purpose of the statute by treating the employees of the charters differently. At the outset, we note that nothing in subsection 11.174(c) *requires* a district to not consult with (a)(2) teachers or equally protect their rights. Local school districts might well treat (a)(2) staff equally for no other reason than a locally elected school board is sensitive to the teachers in their district.[10] The only question is whether they are allowed to draw distinctions, and

---

[10] And at least in this context, section 11.174 addresses schools that are already failing and have likely progressed into the sphere of intervention plans, which may have already included teachers (and other educational professionals) on the "campus intervention team" that is tasked with drawing up a "targeted improvement plan." *Id.* §§ 39A.052, 39A.055.

the entire structure of Subchapter C and D already draws contrasts between TEA approved "open-enrollment charters" and local school board approved "campus or campus program charters" in how they treat administrators, staff, and students.

As we note above, there are significant regulatory differences between Subchapter C and Subchapter D charters. Subchapter C itself provides no express protection for the existing staff's contract rights.[11] Whether the legislature drew those distinctions because local school districts would protect teachers in any event, or the legislature wanted local school districts to have more flexibility, is not a judgment we need to make. We are more concerned with the intent of the legislature as expressed in the words it used in crafting its statutes. And telling here, the legislature requires the Commissioner to prepare an annual report that compares the performance of open-enrollment charters, district granted charters, and matched traditional campuses. *Id.* § 12.1013. It follows that the legislature allows for different models of charter schools with the goal of determining which model yields the best results. That Subchapter C and Subchapter D define different charter models with different rules is not surprising, nor prohibited.

Ultimately, we reject Appellees' counterarguments and conclude the trial court erred by invalidating the Consultation Rule. That rule is consistent with the plain text of subsection 11.174(c), and to ascribe a different meaning to the term "open-enrollment" charter school in one part of the statute from another violates our tenets of statutory construction. *See City of Rockwall*, 246 S.W.3d at 634 (identical words used in different parts of the same act are intended to have the same meaning). Appellees' construction also renders meaningless the distinction between and need for subparagraphs (a)(1) and (a)(2) in subsection 11.174(a). It therefore runs afoul of the

---

[11]At most, subsection 12.057(b) guarantees a charter employee membership in the Teacher Retirement System of Texas to the same extent that non-charter employees enjoy that right. *Id.* § 12.057(b).

tenet of statutory construction that every word of a statute is presumed to have been purposefully used. *Harlingen Family Dentistry*, 452 S.W.3d at 481-82.

The TEC and Commissioner's first issue is sustained.

### B. The Local Policy Rule

Must a partnering contract distinctly identify all the local rules or policies that do not apply to the school campus, or can the contract contain a term globally excluding their application unless they are made applicable in the contract?[12]  That is the essential question for the "Local Policy Rule" that requires a contract term excluding the application of local rules and policies unless they are specifically enumerated in the performance contract.  The issue is less a substantive dispute, than a burden placed on the scriveners of these contracts to treat existing policy and rules as automatically "opted-in" or "opted-out."

Nothing in section 11.174 addresses how the application of existing policies and rules must be treated in partnering contracts.  The Commissioner relies on subsection (m) that generally grants him the  authority to "adopt rules as necessary to administer this section, including requirements for an entity *and the contract with the entity*."  TEX.EDUC.CODE ANN. § 11.174(m) (emphasis supplied).  Appellees, however, contend that because there is no provision in section 11.174 addressing the matter, the Commissioner has drafted a rule in excess of his authority.  Appellees also direct us to section 12.054 that provides that a Subchapter C charter school "is exempt from the instructional and academic rules and policies of the board of trustees from which the campus or program *is specifically exempted in the charter*[.]"  *Id.* § 12.054(1) (emphasis supplied).  Appellees read this section to require a preference for explicit exemptions in the charter, while the

---

[12] The rule also exempts local laws, but we are unsure how an administrative agency has the authority to exempt an entity from a duly enacted law of the State of Texas, or one its subordinate entities, such as a City or County.  That issue is not raised or addressed in the briefs and we do not address it in this opinion.

Commissioner reads the provision as merely establishing a default rule that silence in the charter precludes an exemption by implication.

Section 12.054, however, does not dictate *how* specific a charter must be in identifying exempted rules and policies. That is, if a contract term could exclude the application of "all overtime rules governing summer school" and "all overtime rules governing the Fall and Spring Semester," it could just as easily say "all overtime rules." And for that matter, rather than list by policy number (or however each school district might identify their policies and procedures) all the policies regarding vacation, holiday, dress code, and scheduling, a provision might just as easily aggregate those topics and exclude all "personnel related rules." What then makes it improper to simply say "all local district policies and procedures are excluded except . . ."? All these examples in their own way "specifically" exclude local policies and procedures.

The rationale for the Commissioner's rule is not hard to imagine. The Commissioner is tasked with approval of the partnering contracts within a sixty-day window. TEX.EDUC.CODE ANN. § 11.174(k). It is more efficient to review a contract that contains all its pertinent terms, rather than one that is subject to undisclosed policies and procedures that might only be found at a local school district's office or buried in its meeting minutes. Because the legislature saw fit to give the Commissioner the specific authority to set rules for the performance contract--a contract that the Commissioner is tasked with reviewing--we conclude the Local Policy Rule neither contravenes specific statutory language or otherwise imposes additional burdens, conditions, or restrictions in excess of, or inconsistent with, the relevant statutory provisions. We therefore sustain the TEC and Commissioner's second issue.

20

## C. The Judicial Review Rule

Subject to some exceptions not relevant here, a person aggrieved by "the school laws of this state" or the action of a school district that violate the school laws of this state may file a written appeal with the Commissioner. TEX.EDUC.CODE ANN. § 7.057(a). The Commissioner here concedes that section 11.174 falls within the Titles constituting the "school laws of the state." The question under the Commissioner's third issue is whether there is a right to appeal his decision regarding "eligibility approval" of an (a)(2) application. The Commissioner says no, based on his own rule which makes his decision final "and not subject to appeal under TEC, Section 7.057." 19 TEX.ADMIN.CODE § 97.1079(f). Appellees say yes, based on a general statutory right to appeal that was not abrogated by section 11.174.

"It is well recognized under Texas law that there is no right to judicial review of an administrative order unless a statute provides a right or unless the order adversely affects a vested property right or otherwise violates a constitutional right." *Cont'l. Cas. Ins. Co. v. Functional Restoration Associates*, 19 S.W.3d 393, 397 (Tex. 2000); *see also In re Office of the Attorney Gen. of Texas*, 456 S.W.3d 153, 157 (Tex. 2015) (per curiam). Under the Education Code, however, subsection 7.057(d) provides that "[a] person aggrieved by an action of the agency or decision of the commissioner may appeal to a district court in Travis County." TEX.EDUC.CODE ANN. § 7.057(d).

While subsection 7.057(d) read literally provides an expansive right to judicial review, both parties here acknowledge that the right of appeal is cabined to matters that can be raised under subsection 7.057(a). That provision reads:

(a) Except as provided by Subsection (e), a person may appeal in writing to the commissioner if the person is aggrieved by:

(1) the school laws of this state; or

(2) actions or decisions of any school district board of trustees that violate:

(A) the school laws of this state; or

(B) a provision of a written employment contract between the school district and a school district employee, if a violation causes or would cause monetary harm to the employee.

*Id*. § 7.057(a). The Commissioner contends his decision to approve a charter partner does not fall within subsection 7.057(a), therefore subsection 7.057(d) cannot apply. But based on the plain text of subsection 7.057(a)(1), we simply disagree. *See Pruski v. Garcia*, 594 S.W.3d 322, 325 (Tex. 2020) ("We must apply statutes as written and refrain from rewriting text that lawmakers chose.") (internal quotation marks omitted).

The unstated premise of the Commissioner's argument is that if he makes a decision affecting parties A and B, an affected person C could not appeal to him, asking for a reconsideration of his decision. An example: suppose a school district decided to enlist a "for profit" entity as its charter partner under section 11.174, and submitted an application to that effect to the Commissioner who approved it. The arrangement would violate the "school laws of [the] state" because a "for profit" entity is not eligible for charter status under section 11.174. Under the Commissioner's view, his decision would be final and unappealable. We could envision, however, that a third party affected by that administrative decision might appeal to the Commissioner to reconsider the decision, and if need be, appeal the Commissioner's denial of the reconsideration to a Travis County court. Or alternatively, the school district through its board would have likely voted at some point to pursue the arrangement, and that vote might be challenged under subsection 7.057(a)(2)(A). Either way, a plain reading of the text would allow for an appeal to the Commissioner, and then if necessary, judicial review of the Commissioner's decision.

The Commissioner raises other responsive arguments in support of his rule which we reject. First, the Commissioner notes that some provisions of the Education Code grant a specific

right to appeal, while section 11.174 is silent on appeals. *Cf.* § 49.013(a) ("a decision of the commissioner under this chapter is appealable under Section 7.057."). The lack of a similar provision in section 11.174, however, loses its significance because the converse is also true. In several areas, the legislature has also specifically limited appeals of agency decisions notwithstanding subsection 7.057(d). For instance, the Commissioner is tasked with hearing challenges related to academic or financial accountability rating that affect districts or schools. *Id.* § 39.151(a). In authorizing that review process, the legislature specifically stated "[t]he commissioner's decision may not be appealed under Section 7.057 or other law." *Id.* § 39.151(d); *see also Morath v. Progreso Indep. Sch. Dist.*, No. 03-16-00254-CV, 2017 WL 6273192, at *4 (Tex.App.--Austin Dec. 7, 2017, pet. denied) (mem. op.) (dismissing appeal challenging the Commissioner's accreditation decision and citing section 39.151).[13] Appellees urge that the legislature's pattern of specifically restricting judicial review in some situations, read against its silence on judicial review in section 11.174, actually evidences an intent that judicial review is available under subsection 7.057(d). And to be sure, a legislative non-appealability directive does not appear in section 11.174, which is silent as to legal challenges, judicial review, or appeals of

---

[13] There are more examples. A school district or open enrollment charter school can challenge a decision of the Commissioner to close a district or campus before the State Office of Administrative Hearings. *Id.* § 39A.301. The SOAH's decision, however, per the legislature specific directive and "notwithstanding other law" is "final and may not be appealed." *Id.* § 39A.301(c)(3). The Commissioner also is tasked with making charter revocation decisions, which likewise by specific statutory language are final and "may not be appealed." *Id.* § 12.116(c)(2); *Honors Acad., Inc. v. Texas Educ. Agency*, 555 S.W.3d 54, 59 (Tex. 2018). Similarly, the Commissioner is tasked with developing procedures for the renewal, or denial of renewal, of open enrollment charters. TEX.EDUC.CODE ANN. § 12.1141(a)(d). The legislature decided, however, that "[n]otwithstanding any other law, a determination by the commissioner under Subsection (d) is final and may not be appealed." *Id.* § 12.1141(e). The Commissioner is also required to make certain determinations for Head Start programs germane to obtaining grants. *Id.* § 7.031. By statute, the Commissioner's determination "may not be appealed." *Id.* § 7.031(c)(3); *see also Morath v. Sterling City ISD*, 499 S.W.3d 407, 412-13 (Tex. 2016) (under prior version of Education Code, a statutory finality provision--stating that the Commissioner's determination was "final and may not be appealed"--precluded judicial review of the school district's claim regarding funding formulas); *Texas Educ. Agency v. American Youthworks, Inc.*, 496 S.W.3d 244 (Tex.App.--Austin 2016), aff'd sub nom. *Honors Academy v. Texas Educ. Agemcy*, 555 S.W.3d 54 (Tex. 2018) (Commissioner's order revoking a charter was final and unappealable under subsection 12.116(c)).

the Commissioner's decisions. Accordingly, we cannot read the legislature's silence on judicial review as authority for the Commissioner to eliminate all judicial review.

Next, the Commissioner at oral argument suggests extreme departures from the law (such as with our example above) could be addressed through *ultra vires* claims against the local school district officials. But *ultra vires* claims come with their own set of hurdles, including that they are focused on prospective, and not retrospective relief. *See Progreso Indep. Sch. Dist.*, 2017 WL 6273192, at \*4 (rejecting *ultra vires* claim against Commissioner regarding his decision to lower a schools district's accreditation rating and put a board of managers in charge in part because the action had already been taken). We see no reason why a party must be limited to an *ultra vires* remedy if subsection 7.057(d) already gives a person aggrieved by a decision of the Commissioner a right to litigate that decision.

The Commissioner also finds authority for the rule pre-terminating any judicial review of his decisions in the text of subsection 11.174 (m). That provision allows the Commissioner to make "rules as necessary to administer this section." But precluding judicial review is at best incidental to administering the program. It aides in the administration of the program only in the sense that the Commissioner would never have to defend an agency decision. However, an agency cannot claim a new power it was never given on the theory that such exercise is expedient for the agency's purposes. *See GTE Southwest*, 901 S.W.2d at 407; *see also Davis*, 2021 WL 2172533, at \*4 ("The text of section 7.057(a) dictates the scope of the Commissioner's jurisdiction, and the agency is not at liberty to add to or subtract from the jurisdiction assigned to it.").

We overrule the TEC and Commissioner's Issue Three.

## IV. CONCLUSION

We sustain the TEC and Commissioner's first two issues and reinstate the Consultation Rule (19 TEX.ADMIN.CODE § 97.1075(d)(10) and the Local Policy Rule (19 TEX.ADMIN.CODE § 97.1075(d)(6)).  We overrule the TEC and Commissioner's third issue and affirm that portion of the trial court's judgment invalidating 19 TEX.ADMIN.CODE § 97.1079(f).

JEFF ALLEY, Justice

June 14, 2021

Before Rodriguez, C.J., Palafox, and Alley, JJ.